Affirmed in part, vacated in part, and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Chief Judge WILKINS, Judge MOTZ, Judge TRAXLER, Judge KING, Judge GREGORY, Judge SHEDD, and Judge DUNCAN joined. Judge GREGORY wrote a separate concurring opinion, in *691 which Judge MOTZ joined. Judge NIEMEYER wrote a dissenting opinion, in which Judge WILLIAMS joined.
Judge WIDENER and Judge WILKINSON, being disqualified, did not participate in this case.
OPINION
MICHAEL, Circuit Judge.
Melissa Jennings, a former student and soccer player at the University of North Carolina at Chapel Hill (UNC or the University), claims that her coach, Anson Dor-rance, persistently and openly pried into and discussed the sex lives of his players and made sexually charged comments, thereby creating a hostile environment in the women’s soccer program. Jennings sued UNC, Dorrance, Susan Ehringhaus (Assistant to the Chancellor and legal counsel to UNC), and several other individuals associated with the University, alleging violations of Title IX of the Educational Amendments of 1972 (20 U.S.C. § 1681 et seq.), 42 U.S.C. § 1983, and the common law. The district court awarded summary judgment to the defendants. After considering Jennings’s appeal en banc, we vacate the summary judgment on her Title IX claim, her § 1983 claim against Dorrance for sexual harassment, and her § 1983 claim against Ehringhaus for sexual harassment based on supervisory liability. The summary judgment on the remaining claims and minor procedural rulings are affirmed.
I.
Because Jennings was the non-movant in the summary judgment proceedings, we recite the facts, with reasonable inferences drawn, in her favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). UNC has the country’s most successful women’s soccer program at the college level. The UNC team, with Dorrance as head coach, has won the most national championships in the history of the sport. In light of this record, young women soccer players with exceptional talent covet the opportunity to play on Dorrance’s team. Dorrance personally recruited Jennings while she was in high school, and she joined the UNC team at the start of her freshman year in August 1996. Jennings was one of four goalkeepers until Dorrance cut her from the team in May 1998, at the end of her sophomore year. Jennings was seventeen when she started playing for Dorrance, and he was forty-five.
Once Jennings became a member of the UNC team, she was distressed to learn that Dorrance engaged in sexually charged talk in team settings. Dorrance bombarded players with crude questions and comments about their sexual activities and made comments about players’ bodies that portrayed them as sexual objects. In addition, Dorrance expressed (once within earshot of Jennings) his sexual fantasies about certain players, and he made, in plain view, inappropriate advances to another. This behavior on Dorrance’s part occurred on a regular basis, particularly during team warm-up time at the beginning of practice. The sex-focused talk that Dorrance initiated or encouraged occurred at other times as well, or, as one player put it, “anytime the team was together,” whether “on a plane, in a car, or on a bus, in a hotel, at practice, out of town, at events.” J.A. 1066. Dorrance subjected Jennings or her teammates to sexually charged inquiries and comments in the following particulars.
In front of the entire team, Dorrance asked one player nearly every day “who [her] fuck of the minute is, fuck of the hour is, fuck of the week [is],” whether there was a “guy [she] ha[dn’t] fucked yet,” or whether she “got the guys’ names as they came to the door or ... just took a number.” J.A. 1237-38, 1261-62. He *692 asked a second player if she was “going to have sex with the entire lacrosse team,” and advised a third, “[Y]ou just have to keep your knees together ... you can’t make it so easy for them.” J.A. 1127. Dorrance frequently focused on a fourth player’s sex life with questions such as whether she was going to have a “shag fest” when her boyfriend visited and whether she was “going to fuck him and leave him.” J.A. 1238, 1248. The coach “direet[ed] inquiries]” to a fifth player about the size of her boyfriend’s genitalia. J.A. 1452.
During practice Dorrance regularly commented on certain players’ bodies, referring to their “nice legs,” “nice rack[s],” breasts “bouncing,” “asses in spandex,” and “top heaviness].” J.A. 393, 1073, 1229, 1236. Dorrance also called a player “Chuck” (her name was Charlotte) because he believed that she was a lesbian. J.A. 1228. He inquired pointedly in her presence about her sexual orientation, asking “[D]oes she not like the guys?” J.A. 1283.
Dorrance disclosed his sexual fantasies about several players. He told one player, Debbie Keller, that he would “die to be a fly on the wall” the first time her roommate, another team member, had sex. J.A. 1068. Dorrance admitted to Keller the reason for his fascination about how her roommate might react during sex: he believed the young woman “was a very sexual person by nature,” yet she was a virgin who was “fighting her inner self’ because she was “so religious” (a born-again Christian). J.A. 1070. Another incident in this category occurred during a water break at practice, when Jennings overheard Dorrance tell a trainer that he fantasized about having “an Asian threesome” (group sex) with his Asian players. J.A. 1284-85.
Dorrance did not limit himself to inappropriate speech. He showed overt affection — affection of the sort that was not welcomed- — for one player, Keller, in front of the entire team. He paid inordinate attention to Keller, frequently brushing her forehead, hugging her, rubbing her back, whispering in her ear, dangling a hand in front of her chest, or touching her stomach. Dorrance took other undue liberties with respect to Keller. For example, during one weight-lifting session when the players were lightly clad, Dorrance called Keller over to him and walked her outside “towards the stadium, putting his arms around her.” J.A. 1432. Also, one evening Dorrance telephoned for Keller at home, and one of her roommates (not a soccer player) told him that Keller was out with her boyfriend. Dorrance retorted, “What is she doing, out having sex all over Franklin Street?” J.A. 1073. Dorrance told Keller that he “couldn’t hide his affection for [her]” and said that “in a lifetime you should be as intimate with as many people as you can.” J.A. 1011.
Jennings listened as Dorrance focused on the sex life of one player after another.[1] *693 Jennings sought desperately to avoid Dor-rance’s questions and ridicule about her personal life. She therefore tried to “stay out of [his] radar” by not participating in the discussions. J.A. 1242. She was targeted nevertheless. During a fall tournament in California at the end of Jennings’s freshman season, Dorrance held one-on-one meetings with players in his hotel room to assess their performance for the season. Dorrance told Jennings that she was in danger of losing her eligibility to play soccer if her grades did not improve. In the midst of this discussion, Dorrance asked Jennings, “Who are you fucking?” J.A. 1330. She replied that it was “[n]one of his God damn business” what she did off field. J.A. 1325. As Jennings described the scene, “I was 17 when he asked me that in a dark hotel room, knee-to-knee, bed not made, sitting at one of those tiny tables.” J.A. 1230. She felt acutely uncomfortable.
Jennings again found herself the target of Dorrance’s sexual inquiries in a warmup session during her sophomore year. Some of the players and Dorrance were discussing one player’s weekend, called a “shag fest” by Dorrance, which ended with a young man crawling out of her window. Attention turned to Jennings, who had spent the same weekend with her boyfriend at another school. One player asked, using Jennings’s nickname, “[W]ell, what about Trim’n?”, J.A. 1246, and Dor-rance immediately “chimed in,” saying “[Y]es, what about Trim’n?” J.A. 1252. The coach wanted to know whether Jennings had “the same good weekend” as the player whose weekend he had just described as a shag fest. J.A. 1248. Dor-rance thus encouraged the interrogation about personal sexual activity to “slide over” to Jennings for several minutes. J.A. 1249, 1254-55. She felt humiliated and refused to respond.
Jennings felt “uncomfortable, filthy and humiliated” by Dorrance’s persistent focus on sex and the sexual activities of his players. J.A. 1242. Dorrance’s questions and comments moved from girl to girl to girl, putting Jennings in constant fear that she would be his target at some point, as she was. Jennings could not escape the anxiety that she felt and witnessed in others. She saw two players who were specifically targeted by Dorrance react with tears and facial expressions that portrayed feelings of disgust or unhappiness. The player Dorrance called “Chuck” was offended by his open focus on her sexual orientation. J.A. 1282-83. Amy Steel-man, a player who was not specifically targeted, was “very uncomfortable with [the] sexually charged environment” that Dorrance had “created and encouraged.” J.A. 1452. The environment “was so damaging that it affected [Steelman’s] emotional well-being, and [she] would frequently come home crying” from practice. Id. Keller’s intense discomfort at Dorrance’s constant touching and affection was plainly evident from her body language and facial expression. Keller confirmed that Dor-rance’s touching and caressing “made [her] skin crawl” and made her “fe[el] dirty.” J.A. 1145.
During the fall of her freshman year Jennings notified UNC about the hostile sexual environment that Dorrance had created within the women’s soccer program. She lodged a complaint in a meeting with Susan Ehringhaus, legal counsel to the *694 University and Assistant to the Chancellor. Jennings “gave [Ehringhaus] a [complete] rundown” about Dorrance’s persistence in talking about players’ sex lives when the team was assembled for practice or other activities. J.A. 1343. She reported her feelings of humiliation and discomfort. Ehringhaus dismissed these concerns and suggested that Jennings simply “work it out” with Dorrance. J.A. 1341. Jennings’s complaint thus remained unaddressed by the UNC administration.
Jennings stayed on the team until she was cut by Dorrance during exams at the end of her sophomore year. He cited inadequate fitness as the reason. Over the next several days, Jennings’s parents submitted several complaints to the Chancellor’s office about Dorrance’s regular involvement in discussions about the sexual activities of his players. Thereafter, the Director of Athletics, Richard Baddour, conducted an administrative review pursuant to UNC’s sexual harassment policy. Dorrance admitted that he participated in group discussions with players about their sex lives, but claimed that his comments were only “of a jesting or teasing nature.” J.A. 1531. The review ended with Athletic Director Baddour sending a letter of apology to Jennings’s father and a brief, mild letter of reprimand to Dorrance. Baddour wrote to Mr. Jennings on June 9, 1998, apologizing for Dorrance’s “inappropriate ... involvement in [sexual] discussions” with his team members. J.A. 1531. Dor-rance indicated his own apology by counter-signing the letter. One day later, Baddour wrote to Dorrance declaring it “inappropriate for [Dorrance] to have conversations with members of [the] team (individually or in any size group) regarding their sexual activity.” J.A. 1533.
In August 1998, at the start of Jennings’s junior year, she and Keller brought this action against UNC and several individuals associated with the University, including Dorrance and Ehringhaus, asserting (among others) claims under Title IX and § 1983. After the lawsuit was filed, Jennings was threatened and harassed to the extent that UNC officials warned her that they could not guarantee her safety on campus. At UNC’s urging, she spent her senior year at another school and was then awarded a UNC degree. Keller settled her claims and took a dismissal with prejudice. Jennings’s case proceeded to the entry of summary judgment in favor of the defendants. She appealed and a divided panel of this court affirmed the judgment. Jennings v. Univ. of N.C., at Chapel Hill, 444 F.3d 255 (4th Cir.2006). We vacated the panel decision and reheard the case en banc. Our review of the district court’s grant of summary judgment is de novo. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 283 (4th Cir.2004) (en banc).
II.
Jennings claims that UNC discriminated against her in violation of Title IX by allowing Dorrance, the women’s soccer coach, to subject her to severe and pervasive sexual harassment in the women’s soccer program. Title IX provides that “[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.” 20 U.S.C. § 1681(a). Discrimination under Title IX includes coach-on-student sexual harassment that creates a hostile environment in a school sports program. See Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (stating that teacher’s sexual harassment of student is covered by Title IX). A private right of action against the institution is implied under Title IX, Cannon v. Univ. of Chicago, 441 U.S. 677, 709, 99 S.Ct. 1946, *695 60 L.Ed.2d 560 (1979), and money damages are available as a remedy, Franklin, 503. U.S. at 76, 112 S.Ct. 1028.
To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution. See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir.2002). We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX. See, e.g., Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 651, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); Franklin, 503 U.S. at 75, 112 S.Ct. 1028.
A.
Jennings can establish the first element of her Title IX claim without dispute: she was a student at UNC, an institution receiving federal funds. On the second element of her claim, Jennings must proffer facts showing that Dorrance subjected her to harassment (verbal in this case) based on her sex. See 20 U.S.C. § 1681(a). Sexual harassment occurs when the victim is subjected to sex-specific language that is aimed to humiliate, ridicule, or intimidate. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331-32 (4th Cir.2003). A coach’s sexually charged comments in a team setting, even if not directed specifically to the plaintiff, are relevant to determining whether the plaintiff was subjected to sex-based harassment. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir.2001) (considering, in Title VII case, hostile comments concerning African Americans in general as well as similar comments directed specifically toward plaintiff).
UNC argues that Dorrance’s sex-focused comments were “of a joking and teasing nature” that did not amount to sexual harassment. Appellees’ Br. at 22; see Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (noting that “simple teasing [and] offhand comments” do not amount to sexual harassment) (internal quotation marks and citation omitted). The facts, when viewed in the light most favorable to Jennings, show that Dorrance’s persistent, sex-oriented discussions, both in team settings and in private, were degrading and humiliating to his players because they were women. His conduct went far beyond simple teasing and qualified as sexual harassment. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Ocheltree, 335 F.3d at 332.
Dorrance, in front of the entire team, frequently singled out individual players to find out whether, with whom, and how often they were having sex. He put the questions crudely and bluntly, asking, for example, “[Who is your] fuck of the week[?]”, J.A. 1237, “[Are you] going to fuck [your boyfriend] and leave him [?]”, J.A. 1248, and “How many guys in the [lacrosse] team did [you] fuck?”, J.A. 1238. As Jennings expected, Dorrance ultimately asked her (albeit in private) a similar question, “Who are you fucking?” J.A. 1330. Dorrance even asked one player about the •size of her boyfriend’s genitalia and suggested to another that she “just had to keep [her] knees together.” J.A. 1127. Dorrance fixated on one player’s large breasts, pronouncing that they made her *696 top-heavy and gave her poor balance. These sorts of questions and comments, which frequently carried the strong suggestion of promiscuity, provoked in several players acute feelings of humiliation and degradation that were directly linked to their gender. The nature of Dorrance’s language, in other words, establishes that he was targeting the young women because of their sex. See Ocheltree, 335 F.3d at 332. Finally, Dorrance’s reckless comments about his sexual fantasies — to a trainer that he would like to have group sex with his Asian players and to Debbie Keller that he would like to be a fly on the wall the first time one player had sex— assist in demonstrating that his pronounced interest in discussing his players’ sex lives transcended simple teasing or joking. In short, Jennings proffers sufficient facts for a jury to And that Dorrance subjected her to sexual harassment.
B.
We next consider whether Jennings proffers facts to permit a finding that Dorrance’s sex-based harassment was sufficiently severe or pervasive to create a hostile or abusive environment in the women’s soccer program. Harassment reaches the sufficiently severe or pervasive level when it creates “an environment that a reasonable person would find hostile or abusive” and that the victim herself “subjectively perceive[s] ... to be abusive.” Harris, 510 U.S. at 21, 114 S.Ct. 367. Whether gender-oriented harassment amounts to actionable (severe or pervasive) discrimination “depends on a constellation of surrounding circumstances, expectations, and relationships.” Davis, 526 U.S. at 651, 119 S.Ct. 1661 (quoting Oncale, 523 U.S. at 82, 118 S.Ct. 998). All the circumstances are examined, including the positions and ages of the harasser and victim, whether the harassment was frequent, severe, humiliating, or physically threatening, and whether it effectively deprived the victim of educational opportunities or benefits. See Davis, 526 U.S. at 650-51, 119 S.Ct. 1661; Harris, 510 U.S. at 23, 114 S.Ct. 367. Evidence of a general atmosphere of hostility toward those of the plaintiffs gender is considered in the examination of all the circumstances. See Harris, 510 U.S. at 19, 114 S.Ct. 367 (considering harassment directed at both plaintiff and her female co-workers); see also Spriggs, 242 F.3d at 184 (stating that, “We are, after all, concerned with the ‘environment’ of ... hostility, and whatever the contours of one’s environment, they surely may exceed the individual dynamic between the complainant and [her harasser].”). These standards for judging hostility ensure that Title IX does not become a “general civility code.” See Oncale, 523 U.S. at 80, 118 S.Ct. 998. “[Sjimple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discrimination].” Faragher, 524 U.S. at 788, 118 S.Ct. 2275 (internal quotation marks omitted). “Common sense, and an appropriate sensitivity to social context, will enable courts and juries” to identify objectively hostile or abusive conduct. Oncale, 523 U.S. at 81-82, 118 S.Ct. 998. Here, a jury could reasonably find that Dorrance’s persistent sexual harassment was sufficiently degrading to young women to create a hostile or abusive environment.
Dorrance was not just any college coach. He was and still is the most successful women’s soccer coach in U.S. college history, and he has coached the national team. Dorrance thus had tremendous power and influence over a player’s opportunity for achievement in the soccer world, both at UNC and beyond. As Jennings put it, “[g]irls would cut off their right arm to be [at UNC]” and play for Dorrance. J.A. 1227. Dorrance encouraged his players to confide in him about all aspects of their personal lives, including the details of their *697 sexual activities. He professed to them that he wanted to be a father figure. In reality, Dorrance abused his power as coach to ask his players questions a father would not ask; he pried into and talked openly about his players’ sex lives in a way that was disrespectful and degrading. The disparity in power between Dorrance and his players trapped players into responding to his questions and enduring the environment. See Crandell v. N.Y. College of Osteopathic Med., 87 F.Supp.2d 304, 319 (S.D.N.Y.2000) (denying summary judgment in part because “unequal power relationship” between harasser and victim could support a jury finding of a sexually hostile environment). As the coach, Dorrance controlled everything: team membership, position, playing time, and scholarship eligibility. Even Debbie Keller, the team captain and a star player, was acutely mindful of Dorranee’s enormous power and influence, and she took care not to provoke him. Keller was troubled by Dor-rance’s persistent focus on sex. “[A]ll [of his] comments about his affection” for her, together with the inappropriate touching, “made [her] skin crawl” and made her “fe[el] dirty.” J.A. 1145. Dorrance’s conduct put constant pressure on Keller because she “didn’t want to tick him off to a point ... where he would take it out on [her] by not playing [her].” J.A. 1120. Jennings similarly described the pressure on players to submit to Dorrance’s excessive intrusion into their sex lives: “[H]ow do you say anything [to stop him?] ... You are stuck between a rock and a hard place.” J.A. 1290.
Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment. Davis, 526 U.S. at 651, 119 S.Ct. 1661. Here, Dorrance was a forty-five-year-old man probing into and commenting about the sexual activities of young women, some of whom, like Jennings, were as young as seventeen. Indeed, Jennings felt the extra pressure of age difference when Dorrance called her to his California hotel room to assess her performance as a freshman player. Jennings describes the scene: “I was 17 when he asked me [‘Who are you fucking?’] in a dark hotel room, knee-to-knee, bed not made, sitting at one of those tiny tables.” J.A. 1230.
Jennings had good reason to fear that she too would be targeted by Dorrance, for he had subjected her to a general environment of sexual harassment. She had witnessed his degrading and persistent focus on the sex lives of other players. She observed Dorrance’s sex-based humiliation of several of her teammates, and she heard his demeaning comments. Dorrance openly accused at least three players of being promiscuous, asking them degrading questions such as, “Is there a guy you haven’t fucked yet?”. J.A. 1261-62. Dorrance turned news about visits by boyfriends into speculation about rampant sex. Thus, he asked one player whether she was going to have a “shag fest” when her boyfriend visited, and whether she was “going to fuck him and leave him.” J.A. 1248.
No aspect of his players’ sex lives appeared off limits for Dorrance. He asked one player about the size of her boyfriend’s genitalia. He mocked a lesbian player by calling her “Chuck” and asking in front of the team why “she [did] not like the guys.” J.A. 1283. He expressed his fantasies to a trainer about wanting to have group sex with his Asian players (this Jennings overheard) and to Keller about his voyeuristic interest in watching the first time one player, whom Dorrance believed was a virgin with repressed sexual desire, had intercourse. These two private incidents together with overt displays of affection toward Keller and his graphic comments about the “nice rack[s]” or “nice legs” of certain players, J.A. 1229, 1236, *698 indicate that Dorrance viewed at least some of his players as sexual objects.
Dorrance’s sex-based verbal abuse permeated team settings. It is described by players as occurring frequently, often during team warm-up time, on a typical Monday afternoon (the first practice date after the weekend), or any time the team was together, whether at home or traveling. According to Jennings, two players in particular were targeted with humiliating comments or questions about their sex lives almost every day or every other day.
Dorrance’s persistent talk about his players’ sex lives caused Jennings to live in constant fear that he would at some point direct his “filthy comments” at her, as he shifted his focus from player to player. J.A. 1243. Jennings tried to stay off of Dorrance’s “radar” when he was on the topic of sex, J.A. 1242, but she was nevertheless targeted in the team setting. Thus, in a team warm-up session during Jennings’s sophomore year, Dorrance asked whether Jennings had had “the same good weekend” with her boyfriend as a player whose weekend he had just described as a “shag fest.” J.A. 1248. Jennings was humiliated by this question and did not respond. A jury could reasonably find that Dorrance’s two incidents (the hotel room encounter being the first) of direct harassment of Jennings were more abusive in light of the general, sexually charged environment. In other words, the incidents were not isolated events, but were part of an abusive pattern that instilled fear and dread.
The sexually charged atmosphere perpetuated by Dorrance left other players besides Jennings with feelings of humiliation and discomfort. Keller was repulsed by Dorrance’s inappropriate touching, and she regarded it as “kind of sick” when he told her he “want[ed] to watch [her] friend have sex.” J.A. 1069. Amy Steelman “was shocked by the pervasive and frequent [sexual] discussions” that Dorrance “frequently provoked” and “always encouraged;” she felt “very uncomfortable with his sexually charged environment,” and she “would frequently [go] home crying” as a result. J.A. 1452. Both Jennings and Steelman observed that Dorrance’s comments visibly upset other players as well. One, who was constantly portrayed by Dorrance as sexually promiscuous, was reduced to tears as a result of his accusations. Still another got an upset or disgusted look on her face after Dorrance focused on her breasts (her “rack,” as he put it) and called her top heavy. J.A. 1270-71. A lesbian player, whose sexual orientation was highlighted by Dorrance, was noticeably bothered by this attention. Evidence that other players shared Jennings’s humiliation and discomfort assists in showing that she was objectively reasonable in finding the environment hostile and abusive. Cf. Hayut v. State Univ. of N.Y., 352 F.3d 733, 747 (2d Cir.2003) (characterizing reactions of 'plaintiffs peers to conduct directed at plaintiff as “significant to the mandated objective analysis” of whether conduct was sufficiently severe to be actionable under Title IX).
In sum, Jennings has proffered sufficient facts for a jury to find that Dor-rance’s degrading and humiliating conduct was sufficiently severe or pervasive to create a sexually hostile environment. This conclusion takes into account the informal, sometimes jocular, college sports team atmosphere that fosters familiarity and close relationships between coaches and players. A male coach might use sexual slang in front of his women players, and the players might do the same in front of the coach. Title IX is not a civility code for the male coach who coaches women, and it is not meant to punish such a coach for off-color language that is not aimed to degrade or intimidate. What happened in *699 this case, if Jennings’s version of the facts is believed, is that Dorrance took advantage of the informal team setting to cross the line and engage in real sexual harassment that created a hostile or abusive environment.
A Title IX plaintiff completes her hostile environment showing at the summary judgment stage if, based on her proffered evidence, the sexual harassment “can be said to deprive [her] of access to ... educational opportunities or benefits.” Davis, 526 U.S. at 650, 119 S.Ct. 1661 (emphasis added). Davis explains that a sexual harassment victim “can be said” to have been deprived of access to educational opportunities or benefits in several circumstances, including when the harassment (1) results in the physical exclusion of the victim from an educational program or activity; (2) “so undermines and detracts from the victim[’s] educational experience” as to “effectively den[y her] equal access to an institution’s resources and opportunities”; or (3) has “a concrete, negative effect on [the victim’s] ability” to participate in an educational program or activity. Id. at 650-51, 654, 119 S.Ct. 1661.[2] These alternative ways of showing deprivation or harm are rooted in the statute. Specifically, Title IX states that a covered institution cannot, on the basis of sex, (1) “exclude[ ] [a person] from participation in,” (2) “den[y] [a person] the benefits of,” or (3) “subject[] [a person] to discrimination under any education program or activity.” 20 U.S.C. § 1681(a). Davis hews to the statute in pointing out that sexual harassment reaches the level of actionable discrimination when it has “a concrete, negative effect on [the victim’s] ability” to participate in a program or activity. See Davis, 526 U.S. at 654, 119 S.Ct. 1661. Thus, in relying on Davis’s “concrete, negative effect” language in the discussion that follows, we have neither gutted that case’s deprivation standard nor contravened the text of the statute, as the dissent suggests. See post at 718. In all events, the burden of showing a concrete, negative effect is sufficiently rigorous. It is, in simple terms, an effect that is concrete (or real), negative, and substantial.
Jennings has met the burden here with evidence showing that Dorrance’s severe and pervasive sexual harassment concretely and negatively affected her ability to participate in the soccer program. She testified that the hostile atmosphere created by Dorrance made her feel humiliated, anxious, and uncomfortable; these effects, in turn, had a negative impact on her participation and performance in soccer and on her academic performance. Jennings’s testimony is supported by a psychiatrist’s opinion that Dorrance’s destructive practice of verbal sexual abuse caused her to suffer severe emotional distress.
The dissent suggests that the slight improvements in Jennings’s grades, her belief that she was improving as a player, and her surprise and disappointment at being cut do not depict a player who has been effectively “denied the educational opportunity of playing on the team.” Post at 723. This evidence does not prevent Jennings from establishing that she has a *700 triable issue on the last part of the hostile environment element of her Title IX claim. If anything, it shows how hard Jennings was trying, and what she believed she was achieving, in spite of the hostile environment. When Dorrance cut Jennings from the team in the middle of exams in May 1998, her cumulative GPA was 1.964, below passing. When she finished exams, and the grades were recorded, her GPA was 2.022, barely above passing. This subpar academic performance gives substance to Jennings’s testimony that her GPA was so low because the hostile soccer environment made it difficult for her to focus on her studies.
Likewise, Jennings’s acknowledgment that she was disappointed at being cut does not, at the summary judgment stage, defeat her evidence that she was harmed by the hostile environment, both emotionally and in her performance as a player. Jennings was understandably disappointed because she had lost the opportunity to play on the country’s premier women’s college soccer team. Her disappointment, however, does not detract from the fact that she had to endure sexual harassment in order to play. A jury could reasonably find that the harassment interfered substantially with Jennings’s ability to participate in the soccer program, notwithstanding her desire to stay on the team. At practice, for example, Jennings was in constant fear that Dorrance would direct his questions about sexual activities to her. This prompted her to concentrate on “staying] out of [Dorrance’s] radar” when he was on the subject of sex. J.A. 1242. This surely had a negative effect on her ability to concentrate on soccer. Moreover, the general, sex-charged environment that Dorrance perpetuated caused Jennings to feel humiliated, anxious, and uncomfortable. A jury could reasonably agree with her that the burden of these feelings had a “negative[] impact[]” on her “performance on the soccer field.” J.A. 1585. In sum, a jury could find that the total impact of Dorrance’s severe and pervasive harassment, including the severe emotional distress it caused Jennings to suffer, had a concrete, negative effect on her ability to participate in the soccer program.
C.
Finally, Jennings must provide a basis for imputing liability to UNC for Dorrance’s conduct. An institution can be held liable for a Title IX violation only if “an official who ... has authority to address the alleged discrimination and to institute corrective measures ... has actual knowledge of discrimination in the [institution’s] programs and fails adequately to respond” or displays “deliberate indifference” to discrimination. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).
Jennings’s facts show that in the fall of 1996 Jennings met with Susan Ehringhaus, Assistant to the Chancellor and counsel to the University. Ehringhaus was UNC’s highest ranking lawyer and an official responsible for fielding sexual harassment complaints. Jennings informed Ehrin-ghaus that Dorrance had created an abusive environment in the women’s soccer program. Ehringhaus was given vivid details of Dorrance’s sexual comments about his players when the team was together. Jennings also reported that the situation was causing her intense feelings of discomfort and humiliation. Ehringhaus dismissed this complaint by telling Jennings that Dorrance was a “great guy” and that she should work out her problems directly with him. J.A. 1341^42. Ehringhaus took no action on the complaint, and Dorrance’s harassment continued. These facts are sufficient to establish that Jennings gave Ehringhaus, and by extension UNC, actual notice of the hostile environment created *701 by Dorrance. This notice and the University’s failure to take any action to remedy the situation would allow a rational jury to find deliberate indifference to ongoing discrimination.
For the foregoing reasons, Jennings has presented sufficient evidence to raise triable questions of fact on all disputed elements of her Title IX claim against UNC, and the district court erred in granting the University’s motion for summary judgment.
III.
Jennings asserts § 1983 claims for sexual harassment against Dorrance, Ehringhaus, and several other individuals who were employed by UNC. These defendants, according to Jennings, acted “under color of’ state law to deprive her of “rights, privileges or immunities secured by the Constitution and laws” of the United States, 42 U.S.C. § 1983, specifically her Fourteenth Amendment equal protection right to be free from sexual harassment in an educational setting, see Hayut, 352 F.3d at 743-44. The district court granted summary judgment to all of the individual defendants on these claims, but we conclude that Jennings has triable claims against Dorrance and Ehringhaus.
To survive Dorrance’s motion for summary judgment on her § 1983 sexual harassment claim against him, Jennings must show that he was a state actor, he harassed her because of sex, and the harassment was sufficiently severe or pervasive to interfere unreasonably with her educational activities. See id. at 744 (explaining that § 1983 sexual harassment claims based on a hostile environment theory “are governed by traditional Title VII ... jurisprudence”). First, “ ‘[s]tate employment is generally sufficient to render the defendant a state actor,’ ” and a defendant necessarily “acts under color of state law when he abuses the position given to him by the State.” West v. Atkins, 487 U.S. 42, 49-50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 n. 18, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). As we spell out in detail in part II, supra, Jennings has proffered evidence (1) that Dorrance was a state actor, functioning in his capacity as a coach, when he engaged in sexual harassment and (2) that the harassment was sufficiently severe or pervasive to interfere with her educational activities. The district court therefore erred in granting summary judgment to Dorrance on the § 1983 claim for sexual harassment.
The district court correctly granted summary judgment on identical § 1983 claims against three of Dorrance’s subordinates, assistant coaches William Palladi-no and Chris Ducar, and the athletic trainer, Bill Prentice. Jennings has not offered evidence that the three subordinates participated in sexual harassment.
Jennings’s § 1983 claim against Ehringhaus is based on the theory of supervisory liability. See Baynard v. Malone, 268 F.3d 228, 235 (4th Cir.2001) (“It is well settled that ‘supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.’ ”) (quoting Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.1994)). Jennings proffers evidence that Ehringhaus, as an administrative official with authority to take action against Dorrance, failed to act and thereby allowed Dorrance’s sexual harassment to continue unchecked. More specifically, Jennings’s evidence would allow a jury to find that Ehringhaus had actual knowledge of Dorrance’s misconduct; that her response was “so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices”; *702 and that there exists “an affirmative causal link” between Ehringhaus’s inaction and Jennings’s constitutional injury. See Baynard, 268 F.3d at 235 (quoting Shaw, 13 F.3d at 799). Ehringhaus is therefore not entitled to summary judgment on Jennings’s § 1983 claim against her for supervisory liability.
Summary judgment on this claim was properly awarded to the estate of Michael Hooker (former UNC Chancellor) and to other current or past UNC officials, Richard Baddour, Beth Miller, and John Swofford. There is no evidence that any of these officials learned of Dorrance’s behavior until Jennings was cut from the team. Nor does Jennings suggest that these individuals supported any official policy that enabled the harassment.
Dorrance and Ehringhaus have preserved the issue of qualified immunity. In their summary judgment papers the individual defendants raised qualified immunity as a defense on the § 1983 claims, but gave the issue secondary attention. The district court did not address the question. On appeal the defendants assert qualified immunity as an alternative argument, again giving the matter limited treatment. These circumstances prompt us to decline to consider the question, and thus allow the district court to address it in the first instance on remand. See Brown v. United States, 851 F.2d 615, 620 (3d Cir.1988) (declining to exercise the power to consider qualified immunity in the first instance on appeal).
IV.
The remaining issues raised by Jennings may be dealt with in short fashion. She argues that the district court erred in awarding summary judgment to the individual defendants on her constitutional right to privacy claim brought under § 1983 and to Dorrance on her common law privacy claim. Here, we affirm the district court because none of the defendants either required Jennings to disclose personal information or invaded her records to discover such information. Cf. Thorne v. City of El Segundo, 726 F.2d 459, 468-69 (9th Cir.1983) (finding a constitutional violation where a public job applicant was required to answer questions about her sexual activity as a condition of employment); Toomer v. Garrett, 155 N.C.App. 462, 574 S.E.2d 76, 90 (2002) (stating that the privacy invasion tort includes intrusions such as trespassing, eavesdropping, and peeping into windows). Finally, Jennings argues that the district court erred in denying two of her motions: (1) the motion to strike the defendants’ answer on the ground that their denial of one allegation in the complaint was inconsistent with Dorrance’s deposition testimony, and (2) the motion to strike, as not properly authenticated, certain exhibits (team records) accompanying Dorrance’s affidavit. After considering the arguments and materials relating to these motions, we conclude that the district court did not abuse its discretion in denying them.
V.
For the reasons stated above, we vacate the district court’s grant of summary judgment on Jennings’s Title IX claim against UNC, her § 1983 claim against Dorrance for sexual harassment, and her § 1983 claim against Ehringhaus for sexual harassment based on supervisory liability. We affirm the grant of summary judgment on Jennings’s remaining claims against the individual defendants, and we affirm the procedural rulings. The case is remanded for further proceedings on the open Title IX and § 1983 claims.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

. Jennings herself heard most of the comments recounted above that Dorrance made in front of the team. See J.A. 1229, 1236-38, 1248, 1261-62, 1283. The statements that Dorrance asked a particular player whether she was “going to have sex with the entire lacrosse team,” J.A. 1127, and that he advised another player "to keep [her] knees together,” id., come from Debbie Keller's deposition, as the dissent notes, see post at-n. 1. Nevertheless, Jennings’s account of what was occurring is virtually the same. See e.g., J.A. 1238 (Jennings testifying that Dorrance asked a player, "How many guys in the [lacrosse] team did [you] fuck?”). Amy Steelman, who played with Jennings, reported hearing, in a team setting, Dorrance’s question to a player about the size of her boyfriend’s genitalia. Jennings did not testify about that incident, but it is nevertheless indicative of Dorrance’s pattern of asking abusive questions to a number of different players. With respect to Keller, Jennings heard her say that "she was uncomfortable and didn’t like the touching, the affection — the over-affection she was re *693 ceiving” from Dorrance. J.A. 1291. Jennings witnessed some of Dorrance's displays of affection toward Keller, observing him "putting his arms around her.” J.A. 1432-33. Finally, although Dorrance made the "fly on the wall” comment to Keller before Jennings joined the team, Jennings learned about it because players were still discussing it after she arrived. J.A. 1237.

. Davis’s deprivation standard was formulated in the context of student-on-student harassment. The Supreme Court thus recognized "the practical realities [faced by a school in] responding to student behavior,” noting that "children may regularly interact in a manner that would be unacceptable among adults.” Davis, 526 U.S. at 651, 653, 119 S.Ct. 1661. The Court expressly acknowledged that "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX’s guarantee ... and to have a systemic effect on a program or activity.” Id. at 653, 119 S.Ct. 1661. Student-on-student "harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment” or coach-student harassment. Id.