Joseph M. Hood, Senior U.S. District Judge
This matter comes before the Court on Defendant's Motion to Dismiss Third Amended Complaint. [DE 60]. Having considered the matter fully, and being otherwise sufficiently advised, the undersigned will grant Defendant's Motion to Dismiss Third Amended Complaint [DE 60].
FACTUAL AND PROCEDURAL BACKGROUND
On October 2, 2014, Plaintiff was allegedly raped in her University of Kentucky ("UK") dorm room by John Doe ("Student B"), [redacted]. [DE 57, at 2-3]. While Plaintiff resided in a UK dorm room, she was enrolled as a freshman student at Bluegrass Community and Technical College ("BCTC"), a community college located on UK's campus. Id. Also on October 2, 2014, Plaintiff called the UK Police Department from her dorm room to report the alleged rape. Id. at 4. UK Police Officer Laura Andrews (now Sizemore) responded to Plaintiff's call. Id. Then, Officer Andrews drove Plaintiff and Plaintiff's roommate to UK's Chandler Hospital, where Plaintiff received a Sexual Assault Nurse Examiner ("SANE") examination. Id.
On October 3, 2014, Officer Andrews notified Director of the Office of Student Conduct Denise Simpson, the acting Dean of Students, of the alleged rape. [DE 57, at 4; DE 60, at 4]. Shortly after the October 2, 2014 incident, Plaintiff was allegedly harassed on both campus and social media. [DE 57, at 4]. Also on October 3, 2014, UK issued Student B a no-contact order and interim suspension and notified both Plaintiff and Student B that a student disciplinary hearing was scheduled for October 8, 2014. [DE 57, at 5].
On October 8, 2014, the first student disciplinary hearing was held. Id. Due to a scheduling conflict in which Student B was required to appear before the Fayette District Court for an arraignment on criminal charges, Student B was unbale to attend the first hearing. [DE 60, at 5 (citing [DE 57, at 5; DE 60-2] ) ]. Prior to the first hearing, Student B notified UK of his scheduling conflict and requested a continuance of the hearing, and UK denied Student B's request. [DE 60 (citing [DE 60-2] ) ]. On October 9, 2014, the first hearing panel issued a decision, finding Student B was responsible for sexual misconduct and *622 the corrective action issued was permanent expulsion from UK. [DE 60, at 6].
On October 15, 2014, Plaintiff dropped out of her classes at BCTC and withdrew from UK's campus housing. Id. On October 20, 2014, Student B appealed the first hearing panel's October 9, 2014 decision. Id. On December 4, 2014, the University Appeals Board ("UAB") found that proceeding with the first hearing in Student B's absence constituted reversible error and remanded the matter for a new hearing. [DE 57, at 7; DE 60, at 5 (citing [DE 60-2] ) ].
On December 18, 2014, a second student disciplinary hearing was held, and on December 22, 2014, the second hearing panel found Student B was responsible for sexual misconduct and the corrective action issued was permanent expulsion from UK. [DE 57, at 7-8]. However, based on the alleged advice of UK's Violence Intervention and Prevention Center's ("VIP Center") counselors, Plaintiff did not attend the second hearing. Id. Instead, Plaintiff submitted a written statement to the second hearing panel that she would not attend the hearing because retelling the account of her alleged rape was not beneficial to her healing and recovery. Id. In lieu of Plaintiff's in-person testimony at the second hearing, the second hearing panel heard a recording of Plaintiff's testimony from the first hearing. Id.
On December 28, 2014, Student B appealed the second hearing panel's decision. [DE 57, at 8; DE 60, at 6]. Meanwhile, in January 2015, Plaintiff enrolled in classes at BCTC's [redacted] campus. [DE 57, at 8]. On February 9, 2015, the UAB found that the second hearing panel hearing Plaintiff's recorded statement from the first hearing was a procedural error because the prior UAB decision rendered the record from the first hearing inadmissible. [DE 60-4]. Additionally, the UAB found the second hearing panel erred by admitting the written statements of Plaintiff and her roommate without Student B having had the opportunity to ask questions of Plaintiff and her roommate. Id. Accordingly, the UAB reversed the second hearing panel's December 22, 2014 decision and remanded the matter for a new hearing. Id.
On March 26, 2015, a third hearing was held, and Plaintiff participated by telephone. [DE 57, at 9]. On April 2, 2015 the third hearing panel found Student B was responsible for sexual misconduct, and the corrective action issued was suspension for five years, with any return to UK contingent upon Student B receiving counseling with a licensed therapist regarding anger management and healthy relationship development. Id.
On April 13, 2015, Student B appealed the third hearing panel's decision. Id. at 10. On June 9, 2015, the UAB found the third hearing panel erred by permitting witnesses to testify in each other's presence, prohibiting Student B's advisor from providing whispered guidance during the third hearing, and denying Student B a supplemental proceeding in which to establish sanctions. Id. ; [DE 60, at 7 (citing [DE 60-5] ) ].
In July 2015, Plaintiff and Director of the Office of Student Conduct Denise Simpson discussed a potential fourth hearing. [DE 57, at 10-11; DE 60, at 8]. On August 10, 2015, Plaintiff's recently retained counsel contacted Ms. Simpson via e-mail to provide notice of Plaintiff's counsel's representation, object to the fourth hearing, and assert Plaintiff, if necessary, would participate in a fourth hearing. [DE 60-6]. Additionally, Plaintiff's counsel stated, "[Plaintiff] is in the process of enrolling for school in the fall. She does not yet have her class schedule and needs it to verify her August and September availability.
*623 Once [Plaintiff] knows her schedule going forward, I will provide you with her availability for a fourth hearing." Id. On August 17, 2015, in a subsequent e-mail from Plaintiff's counsel to UK's General Counsel, Plaintiff's counsel stated, "When [Plaintiff] makes a decision, I will let you know as well. Please keep me updated on the [Student B] timeframe moving forward." [DE 60-7].
Throughout the summer of 2015, Plaintiff allegedly received threatening phone calls from someone with a male voice stating, " 'This isn't over yet.' " [DE 57, at 11]. In August 2015, Plaintiff discontinued her education at BCTC and enrolled in a dental assistance certification program with [redacted], an associate degree program that Plaintiff asserts does not provide a path toward a bachelor's degree or any other degree at UK. Id.
On October 1, 2015, Plaintiff filed her First Complaint in this matter, seeking injunctive relief to require UK to comply with Title IX, damages, and other forms of relief. [DE 1]. On January 6, 2016, Defendant moved to dismiss this matter, arguing Plaintiff cannot show Defendant was deliberately indifferent to Plaintiff's complaints of harassment. [DE 5; DE 5-1]. On January 27, 2016, Plaintiff responded to Defendant's Motion to Dismiss, stating, "[Plaintiff] has not made a motion for the Court to enjoin the on-campus proceeding against Student B." [DE 9-1, at 14]. On January 28, 2016, after learning from Plaintiff's Response to the Motion to Dismiss [DE 9] that Plaintiff would not seek to enjoin future student disciplinary proceedings, UK's General Counsel contacted Plaintiff's counsel to schedule a fourth hearing. [DE 60-8].
In the Court's August 31, 2016 Order denying Defendant's Motion to Dismiss [DE 12], the Court found, "The facts, up to and including the third UAB decision, are insufficient to show 'deliberate indifference' on the part of the University." [DE 12, at 8]. However, the Court allowed the Complaint [DE 1] to proceed on the basis that the University may have been deliberately indifferent to Plaintiff by failing to timely schedule a fourth hearing or otherwise bring this matter to a final resolution. [DE 12, at 9].
On September 1, 2016, Defendant attempted to schedule the fourth hearing. [DE 60, at 10 (citing [DE 57, at 12] ) ]. On October 5, 2018, Defendant set the fourth hearing for October 19, 2016. [DE 57, at 12]. The morning the fourth hearing was scheduled to start, Defendant notified Plaintiff the fourth hearing was cancelled and would be rescheduled for the week of November 14, 2016. Id. However, Defendant did not reschedule the fourth hearing until December 19, 2016, when the fourth hearing was set for January 10, 2017. Id. At the fourth hearing, Student B was found not responsible for sexual misconduct. [DE 60, at 11 (citing [DE 57, at 13] ) ]. On January 31, 2017, Plaintiff appealed the fourth hearing panel's decision. [DE 57, at 14]. On April 8, 2017, the Sexual Misconduct Appeals Board ("SMAB"), previously the UAB, denied Plaintiff's appeal. Id. at 15; [DE 60, at 12 n. 6].
On February 20, 2018, Defendant moved for dismissal of Plaintiff's Third Amended Complaint [DE 57], pursuant to Federal Rule of Civil Procedure 12(b)(6). [DE 60]. However, on August 10, 2018, the Court granted Plaintiff's Motion to Clarify [DE 65] that Defendant's Motion to Dismiss [DE 60] should be treated as a Federal Rule of Civil Procedure 56 motion and found, "Defendant's motion goes far beyond the limitations of a Rule 12(b)(6) motion by presenting matters outside the pleadings and is therefore properly construed as a Rule 56 motion." [DE 76, at 2]. Accordingly, the Court held Defendant's *624 Motion to Dismiss [DE 60] in abeyance until the Parties had the opportunity to engage in limited discovery related to Defendant's argument that " 'because the plaintiff was never a student at the University of Kentucky, she has not been deprived of educational opportunities at the University of Kentucky' " and file supplemental briefs. [DE 76, at 3-4]. On October 24, 2018, upon the expiration of the time limits the Court set forth regarding limited discovery and the filing of the Parties' supplemental briefs [DE 82; DE 84], the Defendant's Motion to Dismiss [DE 60] ceased to be held in abeyance.
STANDARD OF REVIEW
Federal Rule of Civil Procedure 12(d) states the following:
If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.
Fed. R. Civ. P. 12(d).
"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.' " Olinger v. Corporation of the President of the Church , 521 F.Supp.2d 577, 582 (E.D. Ky. 2007) (quoting Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). Stated another way, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson , 477 U.S. at 252, 106 S.Ct. 2505. "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " Pennington , 553 F.3d at 450 (citing Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. Chao v. Hall Holding Co., Inc. , 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett , 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56 ; Hall Holding , 285 F.3d at 424 (citing Celotex , 477 U.S. at 324, 106 S.Ct. 2548 ). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." Hall Holding , 285 F.3d at 424 (internal citations omitted).
The Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Pennington v. State Farm Mut. Automobile Ins. Co. , 553 F.3d 447, 450 (6th Cir. 2009) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ). However, the Court is under no duty to "search the entire record to establish that it is bereft of a *625 genuine issue of material fact." In re Morris , 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." Id.
DISCUSSION
In support of dismissal, Defendant argues the following: (1) Since the Court previously ruled Defendant was not deliberately indifferent toward Plaintiff in the first three disciplinary hearings, Plaintiff's claims regarding the first three disciplinary hearings may not be revived by filing a Third Amended Complaint;(2)Plaintiff was not a UK student, so she was not deprived of an educational opportunity under Title IX; (3)"[T]o the extent the Plaintiff seeks to enforce the terms of the Office of Civil Rights sub-regulatory guidance, the private right of action to enforce Title IX does not apply;" and (4) "[T]he Plaintiff fails to state a Title IX retaliation claim." [DE 60, at 1-2].
A. PLAINTIFF'S CLAIM UNDER THE DEPARTMENT OF EDUCATION'S OFFICE OF CIVIL RIGHTS GUIDANCE
Plaintiff admits she is not making a claim under the Department of Education's Office of Civil Rights Guidance. [DE 64, at 18]. Instead, Plaintiff clarifies that she is asserting discrimination and retaliation claims under Title IX. Id. ; see also [DE 57, at 15-16]. Therefore, the Court need not consider Defendant's arguments pertaining to the existence of a private right of action under Title IX for a university's deviation from federal regulatory guidance provided by the Department of Education's Office of Civil Rights Guidance.
B. WHETHER PLAINTIFF IS PROTECTED BY TITLE IX
Before considering Defendant's arguments regarding the first three disciplinary hearings and Plaintiff's alleged failure to state a Title IX retaliation claim, the Court must first answer the threshold question in this case: Is Plaintiff protected by Title IX? As previously mentioned herein, the Court found this question to be of such importance that it held this case in abeyance, so the Parties could have the opportunity to engage in limited discovery and file supplemental briefs. [DE 76, at 3-4]. Having had the opportunity to review the Parties' supplemental briefs [DE 82; DE 84], and being otherwise sufficiently advised, for the following reasons, the Court will find Plaintiff is not protected by Title IX.
Pursuant to Title IX, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...." 20 U.S.C. § 1681(a). "[T]he term 'program or activity' and 'program' mean all of the operations of ... a college, university, or other postsecondary institution, or a public system of higher education ...." 20 U.S.C. § 1687(2)(A). "[R]ecipients of federal funds ... may be liable for damages under Title IX for student-on-student sexual harassment." Vance v. Spencer County Public School Dist. , 231 F.3d 253, 258 (6th Cir. 2000) (citing Davis v. Monroe County Bd. of Educ. , 526 U.S. 629, 653, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) ; Soper v. Hoben , 195 F.3d 845, 854 (6th Cir. 1999), cert. denied , 530 U.S. 1262, 120 S.Ct. 2719, 147 L.Ed.2d 984 (2000) ). In Vance , the Sixth Circuit Court of Appeals found the following:
*626 In Davis , the Supreme Court established that Title IX may support a claim for student-on-student sexual harassment when the plaintiff can demonstrate the following elements:
(1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,
(2) the funding recipient had actual knowledge of the sexual harassment, and
(3) the funding recipient was deliberately indifferent to the harassment.
Vance , 231 F.3d at 258-59 (citing Soper v. Hoben , 195 F.3d 845, 854 (6th Cir.1999) (citing Davis , 526 U.S. at 633, 119 S.Ct. 1661 ) ) ).
In the present case, Defendant admits, "Defendant University of Kentucky is the recipient of federal financial assistance for a 'program or activity,' or program, pursuant to 20 U.S.C. §§ 1681 and 1687." [DE 84-17, at 2]. Additionally, Defendant admits, "[Defendant] is subject to Title IX." Id. Therefore, there is no question whether Defendant is potentially liable for Title IX student-on-student sexual harassment. Instead, the issue before this Court is whether Defendant is liable for alleged student-on-student harassment when the complaining student is not a student at UK.
As the Court stated in its August 10, 2018 Order, "Courts appear to be split on the reach of Title IX to non-students, and make the determination based, at least in part, on the specific circumstances at issue." [DE 76, at 2 (citing Armstrong v. James Madison University , No. 5:16-cv-00053, 2017 WL 2390234, at *7 n. 14 (W.D. Va. Feb. 23, 207) ; Lopez v. San Luis Valley, Bd. of Co-op Educational Services , 977 F.Supp. 1422, 1425 (D. Colo. 1997) ) ].
In Armstrong , a graduate of James Madison University ("JMU") brought Title IX claims against his alma mater after he was expelled from JMU's University Recreation ("UREC") gym following a complaint that he sexually harassed a student while at UREC. Armstrong , 2017 WL 2390234. The Armstrong Court assumed, without deciding, that as an alumnus of JMU, Armstrong's use of UREC was covered by Title IX. Id. at *7 n. 14. To support its assumption, the Armstrong Court explained:
None of the parties have briefed this issue. At oral argument, the Defendants argued that Armstrong is not protected by Title IX because he was not a student at JMU and because UREC's operations are unrelated to JMU's educational mission, but it is unclear whether this argument is entirely correct. Under Title IX, a covered "program or activity" includes "all of the operations of ... a college, university, or other postsecondary institution," 20 U.S.C. § 1687(2)(A), and thus would presumably include UREC. In addition, the broad language of Title IX, which provides that "[n]o person" may be discriminated against on the basis of sex, id. § 1681(a), would seem to include protections for any individual who is subjected to such discrimination by a covered program or activity. Moreover, the Department of Education's Office for Civil Rights maintains that "Title IX protects all persons from discrimination, including parents and guardians, students, and employees." Sex Discrimination: Frequently Asked Questions , U.S. Dep't of Educ. Office for Civil Rights, https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/sex.html (last modified Jan. 24, 2017). This position arguably is broad enough in its sweep to include alumni as well. But see *627 Lopez v. San Luis Valley, Bd. of Coop. Educ. Servs. , 977 F.Supp. 1422, 1425-26 (D. Colo. 1997) (finding that Title IX's coverage extended only to students and school employees). Although extending Title IX's protections to an alumnus's participation in recreational activities appears to stretch the outer limits of the law, it is not necessary to resolve the question of coverage with certainty here because, for the reasons explained infra , Armstrong still fails to state a claim for relief under Title IX.
Armstrong , 2017 WL 2390234, at *7 n. 14.
In the present case, Defendant makes a similar argument to the Defendants in Armstrong. Specifically, both Defendant in the present case and the Defendants in Armstrong argue that Plaintiffs were not students and the activities they were engaged in at the respective universities were unrelated to educational programs. While it is arguable that alumni may be protected by Title IX, Plaintiff in the present action is not a UK alumna. Instead, she is a student from a different school who resides on UK's campus. If "extending Title IX's protections to an alumnus's participation in recreational activities appears to stretch the outer limits of the law," as Armstrong suggests, extending Title IX protections to a student, such as Plaintiff in the present case, who has neither attended the university nor participated in any of the university's educational programs or activities stretches the limits even further.
In Lopez , the Court found:
No court has held that a plaintiff who is neither a potential beneficiary of a federally funded education program nor an employee of such a program can maintain a Title IX action for sex discrimination. Indeed, many courts, in dicta, have limited the range of proper Title IX plaintiffs to students and program employees. See, e.g., Houston v. Mile High Adventist Academy , 846 F.Supp. 1449, 1458 (D.Colo.1994) (parents lack standing to assert Title IX claim); Davis v. Monroe County Board of Educ. , 74 F.3d 1186, 1190 (11th Cir.1996) (stating that employees and students have an implied right of action under Title IX); Murray v. New York Univ. College of Dentistry , 57 F.3d 243, 248 (2d Cir.1995) (same); Doe v. Petaluma City School Dist. , 54 F.3d 1447, 1450 (9th Cir.1995) (same).
Lopez , 977 F.Supp. at 1425. In addition to the courts referenced in Lopez , the First, Fourth, and Tenth Circuit Courts of Appeals have limited Title IX protection to students. See K.T. v. Culver-Stockton College , No. 4:16-CV-165 CAS, 2016 WL 4243965, at *5 (E.D. Mo. Aug. 1, 2016) (citing Simpson v. University of Colorado Boulder , 500 F.3d 1170, 1181 (10th Cir. 2007) ; Jennings v. University of North Carolina , 482 F.3d 686, 695 (4th Cir. 2007) ; Frazier v. Fairhaven School Committee , 276 F.3d 52, 66 (1st Cir. 2002) ); see also Arora v. Daniels , No. 3:17-cv-134, 2018 WL 1597705, at *8 (W.D.N.C. Apr. 2, 2018) ("[T]here is no authority in [the Fourth] Circuit or elsewhere supporting Mrs. Arora's statutory standing to bring suit against an institution which, at the time of the allegations, she did not attend, was not an applicant for, and did not receive federal educational benefits from ...."). In K.T. , the United States District Court for the Eastern District of Missouri, finding a high school student who was allegedly sexually assaulted while visiting a college as a potential soccer recruit lacked standing to assert a Title IX claim against the college, stated:
In dicta, the Tenth Circuit stated without further discussion or citation to authority that a high school girl who attended an off-campus party hosted by a college football player for visiting recruits and alleged that she was sexually *628 assaulted at the party "was not a CU student protected by Title IX[.]".
K.T. , 2016 WL 4243965, at *5 (citing Simpson , 500 F.3d at 1181 ). Additionally, the K.T. Court found, "the Fourth and First Circuits require a plaintiff to allege that 'she was a student' as an element of a Title IX damages claim." K.T. , 2016 WL 4243965, at *5 (citing Jennings , 482 F.3d at 695 ; Frazier , 276 F.3d at 66 ).
Plaintiff argues the K.T. decision does not support Defendant's position because "the Eight[h] Circuit Court in K.T. , when confronted with 'whether K.T.'s status as a non-student precludes her from asserting a Title IX harassment claim,' expressly decided the matter before it without analyzing the question, 'assuming arguendo that it does not.' " [DE 84, at 10 (citing K.T. v. Culver-Stockton College , 865 F.3d 1054, 1057 (8th Cir. 2017) ) ]. However, in K.T. , the Eighth Circuit Court of Appeals affirmed the United States District Court for the Eastern District of Missouri's decision. K.T. , 865 F.3d 1054affirming K.T. , 2016 WL 4243965. The fact that the Eighth Circuit Court of Appeals assumed arguendo that K.T.'s status as a non-student precluded her from asserting a Title IX claim and proceeded to consider the other grounds for dismissal does not mean Defendant's reliance on the underlying K.T. decision is invalid. In fact, in addition to the United States District Court for the Eastern District of Missouri's finding K.T. lacked standing because she was not a student, the United States District Court for the Eastern District of Missouri also "[a]ssum[ed] for purposes of argument that plaintiff as a non-student can assert a private action for damages against the College under Title IX ...," and "the Court ... address[ed] other grounds for dismissal asserted by the College." K.T. , 2016 WL 4243965, at *6.
While most courts have limited Title IX plaintiffs to students and education program employees, as demonstrated by Doe v. Brown University , 896 F.3d 127 (1st Cir. 2018), there exists some debate as to whether other alleged victims may also be protected by Title IX. In Brown University , Jane Doe, a freshman at Providence College, was drugged against her will, transported to a Brown University dormitory, and sexually assaulted by three male Brown University students, who were also members of Brown University's football team. Brown University , 896 F.3d at 128-29. Jane Doe brought a Title IX action, and the United States District Court for the District of Rhode Island found, " 'Doe's status as a non-student [of Brown], regardless of her allegations that the Court accepts as true, removes her from Title IX's private-cause-of-action umbrella of protection.' " Id. at 129-30 (quoting Doe v. Brown Univ. , 270 F.Supp.3d 556, 563 (D.R.I. 2017) ). On appeal, the First Circuit Court of Appeals held that because "[Jane Doe's] complaint did not allege that she participated or even would have participated in any of Brown's educational programs or activities ... Doe's complaint, on its face, fails to establish that she has been 'subjected to discrimination under Brown's educational program[s] or activit[ies].' " Brown University , 896 F.3d at 133 (quoting 20 U.S.C. § 1681(a) ) ). However, affirming the District Court of Rhode Island's decision but not its reasoning, the First Circuit Court of Appeals clarified the following:
[T]hat a victim does not need to be an enrolled student at the offending institution in order for a Title IX private right of action to exist. Members of the public regularly avail themselves of the services provided by educational institutions receiving federal funding. For example, they regularly access university libraries, computer labs, and vocational *629 resources and attend campus tours, public lectures, sporting events, and other activities at covered institutions. In any of those instances, the members of the public are either taking part or trying to take part of a funding recipient institution's educational program or activity. In the case before us, however, Doe failed to allege that she had availed herself of any of Brown University's educational programs in the past or that she intended to do so in the future. She did not plead that Brown University's alleged deliberate indifference to it prevented her from accessing such resources at Brown.
Brown University , 896 F.3d at 132 n. 6.
Here, on October 2, 2014, the date of the alleged rape, Plaintiff was a student at BCTC. [DE 57, at 2-3]. Plaintiff alleges, "she enrolled at BCTC 'with the goal and expectation of obtaining a bachelor's degree from the University of Kentucky.' " [DE 84, at 8 (quoting [DE 57, at 3] ) ]. Additionally, Plaintiff alleges, "[Plaintiff] enrolled in a partnership program between Bluegrass Community and Technical College ("BCTC") and the University of Kentucky ("the University") in order to obtain a quality education and a bachelor's degree." [DE 57, at 1].
Defendant has no record of Plaintiff applying to UK, and Plaintiff is recorded in UK's SAP system as an external with a BCTC identification number. [DE 82, at 4 (citing [DE 82-1, at 2] ) ]. Despite Plaintiff's statements to the contrary, there is no evidence showing Plaintiff was, in fact, enrolled in a partnership program between BCTC and UK or intending to seek a bachelor's degree from UK. UK has two joint programs: the Blue+ and Double Enrollment programs. [DE 82, at 4 (citing [DE 82-2, at 2-3] ) ].
Plaintiff incorrectly asserts, "The BCTC Blue+ program, operated by the University, enrolls a BCTC student at both institutions without having to apply to the University." [DE 84, at 7 (citing [DE 84-8, at 19-21; DE 84-2] ) ]. While the Blue+ program Brochure [DE 84-2] that Plaintiff cites to states, "[BCTC] Students DO NOT complete a UK Admissions application to enroll in the blue+ program[,]" the Brochure [DE 84-2] also makes it abundantly clear that BCTC students "must enroll in blue+ online through the Transfer Center website" and "[c]omplete the online application" then meet with a UK Transfer Adviser and "attend a registration workshop to enroll in a UK class." [DE 84-2]. Additionally, before enrolling in the Blue+ program, BCTC students must meet the following eligibility requirements:
Students must:
+ Be enrolled as a BCTC student and complete one semester
+ Be enrolled in an Associate in Arts or Associate in Science degree program
+ Have a minimum 2.0 cumulative GPA at BCTC
+ Have at least 12 earned credit hours to be eligible to apply to the BCTCblue+ program
+ Be in good academic standing at both BCTC and UK
Id. Plaintiff admits, "[Plaintiff] would have been eligible for the BCTC Blue+ program after completing one semester of classes at BCTC and maintaining a 2.0 average GPA, but could not have applied until that time." [DE 84, at 7 (citing [DE 84-8, at 20-21] ) ]. While it is true Plaintiff did not have to complete a UK Admissions application to enroll in the Blue+ program, she did have to meet the Blue+ program's eligibility requirements, enroll through the Transfer Center's website, complete the online application, meet with a Transfer adviser, and attend a registration workshop [DE 84-2], and Plaintiff did *630 not do so. In fact, Plaintiff was admittedly ineligible to enroll in the Blue+ program until the end of her first semester. [DE 84, at 7 (citing [DE 84-8, at 20-21] ) ]. Therefore, as Defendant correctly asserts, Plaintiff was not enrolled in either the Blue+ or Double Enrollment programs. [DE 82, at 4 (citing DE 82-2, at 2-3] ) ].
In addition to the Blue+ and Double Enrollment programs, UK offers a "degree pathway" that UK describes as follows:
The University of Kentucky is dedicated to enhancing partnerships with community colleges as well as international institutions. One important way of doing this is by creating degree pathways.
A degree pathway is an officially approved agreement used to assist students in taking the appropriate courses at a community college or international school that will transfer for credit toward a bachelor's degree at the University of Kentucky. These agreements are designed to help students make a seamless transition when transferring to the University of Kentucky.
Degree Pathways, http://www.uky.edu/admission/degree-pathways (last visited Dec. 26, 2018). To the extent Plaintiff alleges she was enrolled in UK's Degree Pathways program, Plaintiff has provided no evidence showing her enrollment status in the Degree Pathways program. In responding to Plaintiff's Request for Production of Documents, Defendant asserts, "Persons following the recommendations contained in 'degree pathways' are not enrolled in a [UK] academic program." [DE 82-2, at 3].
A careful review of the Degree Pathways program shows that the program does not appear to be one that BCTC students, such as Plaintiff, can enroll into. Instead, the Degree Pathways program appears to offer Kentucky Community and Technical College System ("KCTCS") students, including BCTC students, four-month course schedules that would not only satisfy the requirements for an associate's degree at KCTCS but also meet the pre-major requirements for a bachelor's degree at UK. Id. In essence, the Degree Pathways program provides KCTCS students with guided curriculums for associate's degrees that would satisfy the pre-major requirements for a variety of majors at the UK and prevent KCTCS students from taking courses at KCTCS community colleges, such as BCTC, that would not transfer to UK or would not fulfill the pre-major requirements for a bachelor's degree at UK. However, the Degree Pathways program does not appear to enroll KCTCS students in any UK program, and the curriculum's provided by UK encourage KCTCS students who are planning to transfer to UK to work with the UK Transfer Adviser each semester to ensure both KCTCS and UK's requirements are met. Id.; see also Transfer Pathway for an Associate in Arts for Anthropology, http://www.uky.edu/admission/sites/www.uky.edu.admission/files/Anthropology_Pathway_Web.pdf (last visited Dec. 26, 2018).
By citing Doe v. Univ. of Notre Dame Du Lac , No. 3:17-CV-690-PPS, 2018 WL 2184392, 2018 U.S. Dist. LEXIS 79778 (N.D. Ind. May 11, 2018), Plaintiff attempts to compare UK's Degree Pathways program to the Gateway Program between Holy Cross College and the University of Notre Dame and asserts, "[In Doe v. Univ. of Notre Dame Du Lac ,] [t]he Court never questioned whether Plaintiff was a student under Title IX, assuming without discussing that the plaintiff was a beneficiary and proceeded to the deliberate indifference standard." [DE 84, at 12-13 (citing Doe v. Univ. of Notre Dame Du Lac , 2018 WL 2184392, 2018 U.S. Dist. LEXIS 79778 ) ].
*631 However, as Plaintiff states, "Students in the gateway program attend Holy Cross for one year, [sic] and are able to transfer to Notre Dame if they maintain a high GPA." [DE 84, at 13]. Specifically, "Gateway students are guaranteed transfer admission following completion of their first year, as long as their cumulative GPA is 3.5 or higher, and grades are a B or higher, and they are in good standing with both institutions." Gateway Program, https://admissions.nd.edu/gateway-program/ (last visited Dec. 26, 2018); see also Gateway Program, https://www.hcc-nd.edu/gateway/ (last visited Dec. 26, 2018). While the University of Notre Dame's Gateway Program is similar to UK's Degree Pathways program in the sense that both programs offer students from a separate school a guided program of courses that will satisfy requirements for a university curriculum, the Gateway Program is distinct because it "invites select students to enroll at Holy Cross College (Notre Dame, Indiana) for their first year of college with a guaranteed transfer agreement to Notre Dame for the start of the student's sophomore year." Gateway Program, https://admissions.nd.edu/gateway-program/ (last visited Dec. 26, 2018); see also Gateway Program, https://www.hcc-nd.edu/gateway/ (last visited Dec. 26, 2018). Furthermore, the Gateway Program expressly states participating students are enrolled in the program, and Holy Cross College charges students who are enrolled in the program a $ 7,000 Gateway Administrative Fee. Gateway Program, https://www.hcc-nd.edu/gateway/ (last visited Dec. 26, 2018).
Unlike the Gateway Program in Doe v. Univ. of Notre Dame Du Lac , the Degree Pathways program in the present case does not appear to enroll students in the program or the university they wish to someday attend, guarantee admission when the student attempts to transfer, or charge students a fee to participate in the program. Accordingly, the Gateway Program in Doe v. Univ. of Notre Dame Du Lac is not analogous to the Degree Pathways program in the present case, and Plaintiff's assertion that she was "a direct beneficiary of educational programs and activities of the University of Kentucky through BCTC's partnership with the University" is unfounded. [DE 84, at 13]. Plaintiff has failed to show she is enrolled in the Degree Pathways program, or that the program is one in which a prospective transfer student can even enroll. Furthermore, since Plaintiff only attended BCTC for approximately one (1) month before dropping out, the Court is unable to ascertain whether Plaintiff intended to complete a Degree Pathways curriculum because Plaintiff did not attend BCTC long enough to complete any of the courses she would have needed to receive credit toward a bachelor's degree at UK. [DE 60, at 6]. For the foregoing reasons, the Court finds Plaintiff was not enrolled at UK either through a dual-enrollment program or a pathway program.
Despite not being enrolled at UK, Plaintiff argues that due to the intertwined nature of her status as a BCTC student living on UK's campus, she was deprived of educational opportunities. [DE 84, at 1-9]. Inarguably, living in a residence hall on UK's campus offered Plaintiff a variety of benefits, obligated her to pay various fees and costs associated with campus living, and required her to follow various policies and rules that she would not have been privy to had she been a BCTC student who commuted to BCTC's campus. As a BCTC student residing on UK's campus, Plaintiff "was required to purchase the UK dining plan, [sic] and to pay mandatory fees to UK for services and activities including the student government association, student activities, student center, student *632 health plan, technology fee, Johnson Center recreation facility, and student affairs." [DE 84, at 1]. Additionally, "[t]he University of Kentucky issued a UK email account and student ID number and card to Doe to facilitate her access to services and activities on campus." Id. Also, "BCTC classes were conducted on the UK campus, in buildings owned (and maintained) by UK, and leased to BCTC." Id. (citing [DE 84-6; DE 84-8] ).
The unique relationship between UK and BCTC at least partially stems from the fact that BCTC was formerly Lexington Community College ("LCC"), "an entity wholly owned and operated by [UK]." [DE 84, at 2]. Once UK agreed to transfer LCC to KCTCS and rename it BCTC, UK and BCTC's relationship effectively became that of a landlord and tenant, respectively. Pursuant to UK and KCTCS's agreement, UK handles many of the maintenance and support services at BCTC, such as "utilities including electric, gas, water, sewer, steam, chilled water, garbage and recycling collection, fire alarm inspection and monitoring, and storm water control," [DE 84, at 3 (citing [DE 84-6, at 23] ) ]; "grounds maintenance ... major repairs ... vehicle maintenance, parking and transportation services for BCTC students and employees," [DE 84, at 3 (citing [DE 84-6, at 23-27] ) ]; UK Police providing "services for all BCTC emergency response[s], criminal investigation[s], Minger and Clery Act reporting, general patrols, and crime prevention," [DE 84, at 3 (citing [DE 84-6, at 27-28] ) ]; and "environmental health and safety services for BCTC ...," [DE 84, at 3-4 (citing [DE 84-6, at 28] ) ]. However, no matter where BCTC is located or what maintenance and support services UK may offer BCTC and its students who live on UK's campus, the fact remains that each benefit Plaintiff received, every fee and cost she had to pay, and every rule she had to follow had no relation to any of UK's educational programs or activities. Instead, Plaintiff's opportunities and obligations pertained to non-educational matters related to living on campus and partaking in non-educational activities, many of which were available to the general public, such as accessing UK's dining facilities, library services, bookstore services, and the VIP Center. [DE 84, at 1-8; DE 82, at 6-7].
Plaintiff attempts to argue that by assigning her a UK ID number and LinkBlue account, she was given access to "University library borrowing privileges" and "University computers." [DE 84, at 6 (citing [DE 84-8, at 9-11] ) ]. However, while Plaintiff used her UK ID number and LinkBlue account to access UK's library and computers, any public person can enter the library and access the same technology with a guest pass, so Plaintiff received no opportunity that was not also available to the general public. [DE 84-8, at 9-11]. Plaintiff's argument regarding library access illustrates one underlying issue with the present action, which is that not only was Plaintiff not participating in any UK educational programs or activities, but the activities she was participating in at UK could also be accessed by the general public and can still be accessed by Plaintiff to this day.
As previously mentioned herein, the First Circuit Court of Appeals in Brown University found that members of the public who avail themselves of university services and participate in university activities, such as libraries, computer labs, campus tours, public lectures, and sporting events, "are either taking part or trying to take part of a funding recipient institution's educational program or activity." Brown University , 896 F.3d at 132 n.6. However, the Court disagrees because while some students may utilize the services and participate in the activities described *633 above, the foregoing services and activities are "not synonymous with 'education' as contemplated by Title IX." Roubideaux v. North Dakota Dept. of Corrections and Rehabilitation , 523 F.Supp.2d 952, 973 (D.N.D. 2007) (finding " 'on-the-job-training' " received by an inmate who is working in the prison industry program is "not synonymous with 'education' as contemplated by Title IX"). To be protected by Title IX, a person must participate in an "education" program or activity. 20 U.S.C. § 1681(a) ; see also Doe v. Mercy Catholic Medical Center , 850 F.3d 545 (3d Cir. 2017) ("In enacting § 1687, however, Congress retained in § 1681(a) the modifier 'education' before 'program or activity.' ").
To provide a better understanding of the meaning of "education program or activity," the Court looks to the Third Circuit Court of Appeals' decision in Mercy. Finding a medical resident sufficiently alleged that a private hospital's medical residency program was an educational program or activity under Title IX, the Mercy Court held the following:
Like the Second Circuit we hold that a "program or activity" under § 1687 is an "education program or activity" under § 1681(a) if it has "features such that one could reasonably consider its mission to be, at least in part, educational." O'Connor v. Davis , 126 F.3d 112, 117 (2d Cir. 1997). This accords with Title IX's text and structure. It lines up with the Eighth and Ninth Circuits' applications of Title IX beyond educational institutions "in the sense of schooling" to entire state-prison systems offering inmates educational programs. See Klinger v. Dep't of Corrs. , 107 F.3d 609, 613-16 & n.5 (8th Cir. 1997) ; Roubideaux [v. North Dakota Dept. of Corrections and Rehabilitation] , 570 F.3d [966] at 976-79 [ (8th Cir. 2009) ] ; Jeldness [v. Pearce] , 30 F.3d [1220] at 1224-25 [ (9th Cir. 1994) ]. It's consistent with the First Circuit's application of Title IX to a university's medical residency program. See Lipsett v. Univ. of Puerto Rico , 864 F.2d 881 (1st Cir. 1988). And it's in step with how twenty-one federal agencies, including the Departments of Education and Health and Human Services, have interpreted the statute. See 34 C.F.R. § 106.1 ; 45 C.F.R. § 86.1 ; Title IX Common Rule, supra , at 52,865 (all saying Title IX applies to "any" education program or activity "whether or not" it's "offered or sponsored by an educational institution"); U.S. Amicus Br. 18-19 n.7. We adopt it.
We recognize, however, that creative minds could conceivably read the word "education" in Title IX to "encompass every experience of life," Roubideaux , 570 F.3d at 977, transforming Title IX into a remedy for any dispute in which someone is "potentially" learning something, Doe [v. Mercy Catholic Medical Center] , 158 F.Supp.3d [256] at 260 [ (E.D.Pa. 2016) ]. We see no sign Congress intended as much. Indeed by merely including the word "education" in § 1681(a), Congress signified that Title IX has some boundary. We endeavor here to delimit it.
Mercy , 850 F.3d at 555.
Here, the services and activities Plaintiff had access to were not comparable to the residency program in Mercy. At best, it is arguable that Plaintiff could have potentially used UK's libraries and computers to learn something, but the potential to learn is not enough to transform the use of libraries and computers that are accessible by the general public into educational programs or activities under Title IX. Id. Accordingly, the Court finds that while Plaintiff was living on UK's campus, paying various fees and costs associated *634 with living on campus, and utilizing UK's services, such as UK's libraries and computer labs, Plaintiff has failed to show she was either a UK student or participating in any of UK's educational programs or activities. Since Plaintiff has failed to show she was either a UK student or enrolled in a UK education program or activity, Plaintiff lacks standing to bring the present action under Title IX, and the Court need not consider Defendant's arguments regarding the first three disciplinary hearings and Plaintiff's alleged failure to state a Title IX retaliation claim.
CONCLUSION
Therefore, having considered the matter fully, and being otherwise sufficiently advised,
IT IS ORDERED as follows:
(1) Defendant's Motion to Dismiss Third Amended Complaint [DE 60] is GRANTED ;
(2) This matter is DISMISSED WITH PREJUDICE ;
(3) This is a final and appealable order; and
(4) The Clerk of Court shall FILE this Order under SEAL .