**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-2203

JANE DOE,

                Plaintiff - Appellant,

     v.

FAIRFAX COUNTY SCHOOL BOARD,

                Defendant - Appellee.

--------------------------------

NATIONAL WOMEN'S LAW CENTER; CHICAGO ALLIANCE AGAINST SEXUAL EXPLOITATION; CLEARINGHOUSE ON WOMEN'S ISSUES; DESIREE ALLIANCE; FEMINIST MAJORITY FOUNDATION; FORGE, INCORPORATED; GENDER JUSTICE; GIRLS INC.; HUMAN RIGHTS CAMPAIGN; IN OUR OWN VOICE: NATIONAL BLACK WOMEN'S REPRODUCTIVE JUSTICE AGENDA; KWH LAW CENTER FOR SOCIAL JUSTICE AND CHANGE; LEGAL AID AT WORK; NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM; NATIONAL ASSOCIATION OF SOCIAL WORKERS, and its Virginia Chapter; NATIONAL CRITTENTON; NATIONAL NETWORK TO END DOMESTIC VIOLENCE; NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES; NATIONAL WOMEN'S POLITICAL CAUCUS; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; STOP SEXUAL ASSAULT IN SCHOOLS; WOMEN'S LAW CENTER OF MARYLAND, INCORPORATED; TRANSGENDER LAW CENTER; WOMEN LAWYERS ASSOCIATION OF LOS ANGELES; WOMEN LAWYERS ON GUARD INC.; WOMEN'S BAR ASSOCIATION OF THE STATE OF NEW YORK; WOMEN'S LAW PROJECT,

                Amici Supporting Appellant.

NATIONAL SCHOOL BOARDS ASSOCIATION; VIRGINIA SCHOOL BOARDS ASSOCIATION; MARYLAND ASSOCIATION OF BOARDS OF

EDUCATION; NORTH CAROLINA SCHOOL BOARDS ASSOCIATION; SOUTH CAROLINA SCHOOL BOARD ASSOCIATION,

Amici Supporting Appellee.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, Senior District Judge. (1:18−cv−00614−LO−MSN)

_____

Argued: January 25, 2021                          Decided: June 16, 2021

_____

Before NIEMEYER, WYNN, and THACKER, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Wynn wrote the opinion, in which Judge Thacker joined. Judge Niemeyer wrote a dissenting opinion.

_____

**ARGUED:** Alexandra Brodsky, PUBLIC JUSTICE, PC, Washington, D.C., for Appellant. Stuart A. Raphael, HUNTON ANDREWS KURTH LLP, Washington, D.C., for Appellee. **ON BRIEF:** Linda M. Correia, Lauren A. Khouri, CORREIA & PUTH, LLC, Washington, D.C.; John R. Ates, ATES LAW FIRM, PC, Towson, Maryland; Adele P. Kimmel, PUBLIC JUSTICE, PC, Washington, D.C., for Appellant. Trevor S. Cox, Richmond, Virginia, Sona Rewari, HUNTON ANDREWS KURTH LLP, Washington, D.C., for Appellee. Emily Martin, Neena Chaudhry, Sunu Chandy, Elizabeth Tang, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Emily P. Mallen, Marisa S. West, Michele L. Aronson, SIDLEY AUSTIN LLP, Washington, D.C., for Amici National Women's Law Center, et al. Robert W. Loftin, Summer L. Speight, Heidi E. Siegmund, Richmond, Virginia, R. Craig Wood, MCGUIREWOODS LLP, Charlottesville, Virginia, for Amici National School Boards Association, Virginia School Boards Association, Maryland Association of Boards of Education, North Carolina School Boards Association, and South Carolina School Boards Association.

_____

WYNN, Circuit Judge:

Plaintiff "Jane Doe," a former student at Oakton High School in Vienna, Virginia, brought this Title IX action against the Fairfax County School Board ("School Board"), alleging that her school's administrators acted with deliberate indifference to reports that she had been sexually harassed by another Oakton student, "Jack Smith."[1] At the end of a two-week trial, the jury ruled against Doe, based on its finding that the School Board did not have actual knowledge of the alleged sexual harassment. Doe subsequently moved for a new trial, which the district court denied. For the reasons set forth below, we reverse that judgment and remand the case for a new trial.

I.

A.

The following facts are undisputed except where noted otherwise.

On March 8, 2017, Doe, a junior at Oakton High School and a member of the school's symphonic band, traveled with the band by bus to Indianapolis to perform at a music festival. During the bus trip, Doe sat next to Smith, an older male student. Smith told Doe that he was cold and asked her if she had a blanket. When Doe offered her blanket to Smith, he put it over both of their bodies.

Doe alleges that Smith then repeatedly touched her breasts and genitals and penetrated her vagina with his fingers despite her efforts to physically block him, and that

---

[1] "Jane Doe" and "Jack Smith" are pseudonyms.

he also repeatedly put her hand on his penis even after she moved it away. She testified at trial that during this incident, she felt so "confused," "shocked," and "scared" that she was "frozen in fear the whole time." J.A. 1712, 1800.[2]

Soon after arriving in Indianapolis, Doe told two friends about the incident. They, in turn, relayed what they had heard to school administrators, allegedly reporting that Smith had touched Doe "down her pants and up her shirt" without her consent, "forced her hand on his penis," and "sexually assaulted [Doe.]" J.A. 383–86, 419–24.

At trial, Assistant Principal Jennifer Hogan testified that before the end of the five-day band trip, she knew that she was dealing with the "possibility" of a "sexual assault." J.A. 1186–87. But school officials—including Assistant Principal Michelle Taylor, who accompanied the band to Indianapolis—took no action regarding these reports during the trip, and they did not speak to either Doe or her parents about what had happened on the bus ride.

Once the band returned from its trip, Assistant Principal Hogan called Doe into her office for an interview and requested that Doe provide a written statement. Doe's statement read: "I moved my hand away but [Smith] moved my hand back onto his genitals. I was so shocked and scared that I did not know what to say or do. He then started to move his hands towards me and I tried to block him but he still put his hands up my shirt and down my pants." J.A. 2515. During this meeting, Oakton's Safety and Security Specialist, Wally Baranyk, asked Doe if the sexual activity had been consensual, and Doe responded, "I don't

---

[2] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

think it was consensual." J.A. 2518. Hogan interpreted this statement as meaning that Doe "didn't want to be a participant" and that there was "a lack of consent." J.A. 1207–08.

Hogan and Baranyk then interviewed Smith, who initially denied that he touched Doe sexually against her will or made her touch his penis without her consent. But later in the meeting, he changed his story, admitting that he did in fact "grab[]" her and touch her breasts. J.A. 1332–33. He continued to deny that he touched Doe under her pants.

Assistant Principal Hogan also spoke with two other band students to see if they had seen anything on the bus. Meanwhile, school officials continued to receive reports from other concerned members of the school community—including both students and parents—suggesting that Doe had been a victim of a "non-consenting sexual act" and "sexual harassment." J.A. 2523, 2526.

After the investigation, Hogan and Principal John Banbury discussed "whether this was or wasn't a sexual assault" and ultimately concluded that "the evidence that [they] had didn't show that [they] could call it a sexual assault." J.A. 1291. They also decided against disciplining either Doe or Smith for engaging in sexual activity while on a school trip.

Afterwards, in a meeting between Hogan and Doe's parents, Doe's mother stated that Smith's touching of Doe was nonconsensual and thus "a sexual assault." J.A. 1298–

5

99, 1613. Hogan responded that the administration had concluded that what happened on the bus did not amount to sexual assault.

After the band trip, Doe sought and received professional counseling for multiple weeks, and she was diagnosed with adjustment disorder with anxiety.[3] During the rest of her junior year, Doe was terrified of seeing or being near Smith, which caused her to go out of her way to avoid him at school and also to refrain from fully participating in band activities. Doe stated at trial that she felt "so uncomfortable being around . . . Smith that [she] had to sit out of band class" for a period of time, instead attending class by sitting in a small practice room by herself. J.A. 1755. And Doe continued to find it difficult to enjoy and fully participate in her band classes even after Smith had graduated. Meanwhile, her parents requested, and her teachers provided, a number of accommodations to help Doe cope with the psychological and emotional trauma resulting from the alleged sexual assault.

## B.

Doe brought the instant Title IX action against the School Board in May 2018, asserting that her school had acted with deliberate indifference to reports of her sexual assault. The case went to trial in July 2019. During trial, the School Board moved for

---

[3] "An adjustment disorder is an emotional or behavioral reaction to a stressful event or change in a person's life" that "significantly interfere[s] with social, occupational or educational functioning." Johns Hopkins Med., *Adjustment Disorders*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/adjustment-disorders. Adjustment disorder with anxiety is one of the subtypes of adjustment disorder, and its symptoms "mainly include nervousness, worry, difficulty concentrating or remembering things, and feeling overwhelmed." Mayo Clinic, *Adjustment Disorders* (Oct. 25, 2017), https://www.mayoclinic.org/diseases-conditions/adjustment-disorders/diagnosis-treatment/drc-20355230.

judgment as a matter of law, arguing that Doe could not prove deliberate indifference or any deprivation of access to educational opportunities or benefits. The district court denied the motion.

Ultimately, the jury returned its verdict for the School Board. The jury found that Smith had sexually harassed Doe and that the harassment had been severe, pervasive, and offensive enough to deprive Doe of equal access to the educational opportunities or benefits provided by her school. However, the jury also found that the School Board did not have actual knowledge of the alleged sexual harassment. Because that finding ended Doe's claim, the jury did not reach the question of whether the School Board had acted with deliberate indifference to the alleged harassment.

After the district court denied Doe's motion for a new trial, Doe filed a motion to reconsider, which was also denied. She timely appealed.

II.

Doe raises several different grounds for granting a new trial or, alternatively, vacating the district court's decision and remanding for reconsideration of her motion for a new trial. But principally, she argues that the district court erred by misconstruing what it means for a school to have actual notice or knowledge of alleged harassment in Title IX cases, and that a new trial must be granted because no evidence in the record supports the jury's verdict under the correct legal standard.

We agree. As discussed below, we hold that a school's receipt of a report that can objectively be taken to allege sexual harassment is sufficient to establish actual notice or knowledge under Title IX—regardless of whether school officials subjectively understood

7

the report to allege sexual harassment or whether they believed the alleged harassment actually occurred.[4] We further conclude that under this standard, no evidence in the record supports the jury's conclusion that the School Board lacked actual notice of Smith's alleged sexual harassment of Doe. Accordingly, we reverse and remand for a new trial.[5]

A.

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To establish a Title IX claim based on student-on-student sexual harassment, a plaintiff must show that:

(1) they were a student at an educational institution receiving federal funds;

(2) they suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school;

(3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and

(4) the school acted with deliberate indifference to the alleged harassment.

---

[4] As explained below, "actual notice" and "actual knowledge" are interchangeable terms for Title IX purposes. For stylistic convenience, we use the term "actual notice" throughout this opinion to refer to the requisite notice or knowledge that a defendant school board must have in order to be held liable under Title IX.

[5] Doe's other arguments on appeal also relate to actual notice. Because we conclude that under the correct legal standard the record evidence all but establishes that the School Board had actual notice of the alleged sexual harassment, and because we grant a new trial on that basis, we need not and do not address Doe's alternative arguments.

8

*See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646–52 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–92 (1998); *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc).[6]

At the center of this case is the third prong—the actual notice requirement—which the jury found was not met. Doe argues that a school's receipt of a report that can objectively be understood as alleging sexual harassment is sufficient to establish actual notice—regardless of whether the school in fact construed such a report as one alleging sexual harassment, or whether the school believed the allegations to be true. In contrast, the School Board contends that such notice exists only where a school official with corrective authority becomes *subjectively* aware that the alleged sexual harassment has occurred or is occurring. Thus, the critical issue we must decide is: What establishes a school's actual notice in Title IX cases? This is a question of law subject to *de novo* review. *See Fonner v. Fairfax Cnty.*, 415 F.3d 325, 330 (4th Cir. 2005).

---

[6] In *Jennings*, we set forth a nearly identical test to the one we articulate here, based on the Supreme Court's decisions in *Davis* and *Gebser*. *See* 482 F.3d at 695, 700. We explained that a plaintiff seeking to establish a Title IX sexual harassment claim must show, among other things, that "the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity." *Id.* at 695. This formulation differs slightly from the language that the Supreme Court used to articulate the same requirement in *Davis*—i.e., "a plaintiff must establish sexual harassment . . . that is *so severe, pervasive, and objectively offensive*[] . . . that [they are] effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. 651 (emphasis added). Because *Davis*, like this case and unlike *Jennings*, involved student-on-student harassment, we have modified the *Jennings* test to more precisely track *Davis* for purposes of this case. *Compare Jennings*, 482 F.3d at 691, *with Davis*, 526 U.S. at 632–33.

B.

Although the Fourth Circuit has not explicitly ruled on this issue, our *en banc* decision in *Jennings v. University of North Carolina* compels us to agree with Doe's position—which, as explained below, is consistent with relevant Supreme Court precedent and that of our sister circuits.[7]

In *Jennings*, a former student and soccer player at the University of North Carolina at Chapel Hill brought a Title IX claim against the university, alleging that the school had "allow[ed] . . . the women's soccer coach[] to subject her to severe and pervasive sexual harassment." 482 F.3d at 694. She met with a high-ranking university official responsible for dealing with Title IX grievances during her freshman year and lodged a complaint against the coach, describing multiple instances of sexual harassment and the hostile and abusive environment in the women's soccer program. *See id.* at 693–94, 700. The official, however, "dismissed these concerns and suggested that [the plaintiff] simply 'work it out' with [the coach]." *Id.* at 694. Accordingly, the university took no action on the plaintiff's complaint. *See id.* at 700.

We held in *Jennings* that the fact that the plaintiff filed a complaint alleging sexual harassment with an official with authority to address the alleged harassment and to institute corrective measures was "sufficient to establish that" the plaintiff had given that official—

---

[7] Although *Jennings* involved harassment by a coach, rather than by a fellow student, that distinction is irrelevant to the actual-notice inquiry. As *Davis* makes clear, the actual-notice requirement adopted in *Gebser*—which dealt with teacher-on-student harassment—is equally applicable in Title IX cases involving student-on-student harassment. *See Davis*, 526 U.S. at 642–43, 647, 650.

"and[,] by extension," the university—"actual notice of the hostile environment created by [the soccer coach]." *Id.* at 700–01; *see also id.* at 701 (noting as to the plaintiff's § 1983 supervisory liability claim against the same university official that "[her] evidence would allow a jury to find that [the official] had actual knowledge of [the coach's] misconduct"). Importantly, nothing in our discussion of actual notice indicated that the analysis turned on whether the university official *subjectively* understood that the plaintiff was making an allegation of sexual harassment or that the alleged harassment was actually occurring. Rather, we concluded that by alleging facts that objectively amounted to sexual harassment, the plaintiff put the university on actual notice of the alleged harassment. *See id.* at 700–01.

In arguing that allegations of harassment alone cannot establish actual notice, the School Board repeatedly cites our decision in *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001). But its reliance on *Baynard* is misplaced for two reasons. First, *Baynard* held that even where a school was informed of allegations that one of its teachers had a *history* of sexually abusing his students in the past, such that the school was aware of allegations supporting a general, "*substantial risk*" of—or "the *potential*" for—ongoing or future misconduct by that teacher, an awareness of such possibilities did not constitute actual notice of the teacher's current abuse for Title IX purposes. 268 F.3d at 237–38. Rather, to establish such notice, the plaintiff had to show that the school was aware of an allegation that the teacher was *currently* abusing a student—although the school did not need to know the identity of the student allegedly being abused. *See id.* 237–38 & n.9. Thus, nothing in *Baynard* suggested that a report alleging a *specific act or instance* of sexual harassment

11

suffered by the plaintiff would be insufficient to establish actual notice. Moreover, regardless of what we held in *Baynard*, our subsequent *en banc* decision in *Jennings* is the controlling law.

Therefore, in keeping with our decision in *Jennings*, we hold that when a school official with authority to address complaints of sexual harassment and to institute corrective measures receives a report that can objectively be construed as alleging sexual harassment, that receipt establishes actual notice of such harassment for Title IX purposes.

Our understanding of the actual-notice standard is consistent with applicable Supreme Court precedent. The actual-notice requirement originates from the Supreme Court's decision in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 285 (1998). There, the Court rejected the plaintiff's argument that an educational institution could be liable under Title IX via *respondeat superior* or constructive notice. *Id.* Instead, "to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs," the Supreme Court held that "a damages remedy will not lie under Title IX" unless the defendant school or school district had "actual notice" or "actual knowledge" of the alleged misconduct. *Id.* at 288–90.

The *Gebser* decision buttresses our holding today. First, we deem it significant that *Gebser* used the terms "actual notice" and "actual knowledge" interchangeably. *See generally id.* "Knowledge" is a broad and somewhat ambiguous term. For instance, "knowledge" can mean merely "[a]n awareness . . . of a fact or circumstance" or the "condition of having information" about something, but it can also denote "a state of mind in which a person has no substantial doubt about the existence of a fact." *Knowledge*,

Black's Law Dictionary (11th ed. 2019); *Knowledge*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/knowledge. In other words, the word "knowledge" may describe either an objective condition of having information about something or a subjective condition of understanding or believing in the existence of that thing. In contrast, "notice" has a more specific definition that describes the objective "condition of being warned or notified" of, or having "received information about," a fact or circumstance. *Notice*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/notice; *Notice*, Black's Law Dictionary.

Given that "knowledge" has several meanings, one of which denotes "notice," the Supreme Court's interchangeable use of those two words in *Gebser* suggests that the more specific term, "notice," is what the Court really meant. Thus, the *Gebser* Court seems to have used both "actual knowledge" and "actual notice" to mean information or notification regarding a fact or condition "given directly to, or received personally by, a party." *Actual Notice*, Black's Law Dictionary.

This reading is reinforced by the Supreme Court's explanation in *Gebser* that to be liable under Title IX, an appropriate school official must be "*advised of*" the alleged misconduct. *Gebser*, 524 U.S. at 290 (emphasis added). To be "advised" of something means to be "inform[ed]" or "give[n] information or *notice*" about it. *Advise*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/advise (emphasis added). Thus, *Gebser* indicates that a school has actual notice or knowledge when it is informed or notified of the alleged harassment—most likely via a report.

The Supreme Court's application of the actual-notice standard to the facts in *Gebser* confirms this understanding. The Court held that the defendant school district lacked actual notice because a complaint from parents of students other than the plaintiff regarding a teacher's inappropriate comments during class "was plainly insufficient to *alert the principal to the possibility* that [the teacher] was involved in a sexual relationship with [the plaintiff]." *Gebser*, 524 U.S. at 291 (emphasis added). If actual notice means being "alerted" to the "possibility" of sexual harassment occurring, a report alleging such harassment surely is sufficient to establish it.

The Supreme Court's subsequent decision in *Davis v. Monroe County Board of Education* further bolsters this conclusion. There, the Court addressed for the first time a Title IX claim involving student-on-student harassment. *See* 526 U.S. 629 (1999). Importantly, in discussing the deliberate-indifference requirement for Title IX claims, the Court asked "whether [the] petitioner can show that the Board's response to *reports of [the harasser's] misconduct* was clearly unreasonable." *Id.* at 649 (emphasis added). Ultimately, the Court reversed the dismissal of the plaintiff's complaint, finding that she "may be able to show both actual knowledge and deliberate indifference" based on the school board's failure to adequately respond to repeated "complaints" and "allegations" of misconduct. *Id.* at 649, 653–54. Thus, the Supreme Court again indicated that complaints, allegations, or reports of gender-motivated harassment (including sexual harassment) are sufficient to show actual notice for Title IX purposes. *See also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 180 (2005) (explaining that a school board acting indifferently to a complaint alleging sexual harassment "would likely be liable for a Title IX violation");

14

*id.* at 181 ("Title IX's enforcement scheme . . . depends on individual reporting because individuals and agencies may not bring suit under the statute unless the recipient has received 'actual notice' of the discrimination.").

Our understanding of actual notice comports with the nearly unanimous view of our sister circuits. The Seventh Circuit has held that "[t]o have actual knowledge of an incident, school officials must have witnessed it *or received a report of it*." *Doe v. Galster*, 768 F.3d 611, 614 (7th Cir. 2014) (emphasis added). Likewise, nearly all other courts of appeals have found actual notice established where the plaintiff or another interested person reported the alleged sexual harassment to a school official with authority to address the alleged harassment and to institute corrective measures. *See, e.g.*, *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 372 (5th Cir. 2019); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89–90 (2d Cir. 2011); *Santiago v. Puerto Rico*, 655 F.3d 61, 74 (1st Cir. 2011); *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1255 (11th Cir. 2010); *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006); *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 173 (3d Cir. 2002); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000); *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1247 (10th Cir. 1999); *see also Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) ("[T]he actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student." (citation omitted)). *But see Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 780, 782 (8th Cir. 2001) (suggesting that actual knowledge requires conclusive evidence of misconduct).

15

As a final note, common sense and public policy considerations further counsel us to hold that a school's receipt of a report or complaint alleging sexual harassment is sufficient to satisfy the actual-notice requirement. As Doe and the amici civil rights groups correctly point out, "[a]ny other rule would lead to absurd results." Opening Br. at 32; *see also* Amicus Br. of Nat'l Women's L. Ctr. at 23–33. If, as the School Board and the amici school board associations claim, actual notice required that an appropriate school official *subjectively* understood the plaintiff's complaint as one alleging sexual harassment, schools involved in Title IX lawsuits could avoid liability simply by arguing that they did not know that the report described sexual harassment. Such a rule would undermine Congress's goal of protecting students from sex discrimination in education, as it would create "perverse incentives" for schools to refrain from training their staff to better identify instances of sexual harassment as well as from investigating reports of harassment—in order to avoid ever acquiring actual notice. Amicus Br. of Nat'l Women's L. Ctr. at 28–29. Furthermore, "[t]he consequences of [a subjective actual-notice standard] are especially concerning as applied to children, who cannot be expected to articulate the sexual abuse and harassment they suffer in the same words as adults." *Id.* at 25.

To the extent that the School Board suggests that actual notice means a school official's subjective knowledge or conclusion that the alleged sexual harassment actually occurred, such a standard would be even more nonsensical. Under Title IX, a school's actual notice of the alleged sexual harassment is what triggers its duty to investigate. *See Davis*, 526 U.S. at 649–50. It would be illogical to require a school to investigate a complaint alleging sexual harassment only if it has *already* determined that such

16

harassment did in fact occur. *See* Amicus Br. of Nat'l Women's L. Ctr. at 23–25. As Doe correctly notes, a school's determination as to whether the alleged harassment actually occurred is relevant only to the deliberate-indifference prong, not the actual-notice requirement.

Nor would it make sense to require a student alleging sexual harassment to bear the burden of substantiating their claim with adequate evidence at the time of their initial report, *before* the school undertakes an investigation. The School Board and the amici school board associations contend that allowing a student's unsubstantiated complaint to establish actual notice would mean that schools would be "liabl[e] based on mere gossip or rumor." Response Br. at 40 (emphasis added); *see also* Amicus Br. of Sch. Bd. Ass'ns at 4. This argument is meritless for two reasons. First, it is a straw man. Doe has never argued that a school acquires actual notice whenever a faculty member simply overhears *gossip* or a *rumor* concerning sexual harassment. Rather, she asserts that a school has actual notice when it receives a *report* or *complaint* directly alleging sexual harassment. But more importantly, the School Board's concern is unfounded. Title IX liability requires not only actual notice but also proof of deliberate indifference, which is a high bar. If a school becomes aware of an unsubstantiated allegation of sexual harassment, duly investigates it, and reasonably dismisses it for lack of evidence, the school would not be liable since it did not act with deliberate indifference.

For the foregoing reasons, we hold that a school's receipt of a report or complaint alleging sexual harassment is sufficient to establish actual notice under Title IX. This is an objective inquiry which asks whether an appropriate official in fact received such a report

17

or complaint and whether a reasonable official would construe it as alleging misconduct prohibited by Title IX. Having established the appropriate standard, we now proceed to analyze Doe's claim.

C.

Doe argues that the district court erred in denying her motion for a new trial because no evidence in the record supports the jury's verdict that the School Board lacked actual notice of the sexual assault allegations. We agree.

Under Federal Rule of Civil Procedure 59(a), a "court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Despite the permissive language of this Rule, we have interpreted it to require district courts to "set aside the verdict and grant a new trial" where "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014) (quoting *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001)); *see also Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996) (labeling this the "duty" of the district court (quoting *Aetna Casualty & Sur. Co. v. Yeatts*, 122 F.2d 350, 352–53 (4th Cir. 1941), *overruled on other grounds by Gasperini v. Ctr. for Human., Inc.*, 518 U.S. 415 (1996))).

Doe asserts that the jury's finding on actual notice was against the clear weight of the evidence and therefore that the district court should have granted her a new trial. As a

18

general matter, this Court reviews a district court's denial of a motion for a new trial for abuse of discretion. *See Minter*, 762 F.3d at 346. But where, as here, a party did not move for judgment as a matter of law before moving for a new trial, this Court's "scope of review is exceedingly confined, being limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency." *Id.* at 348 (quoting *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 187 (4th Cir. 1994)). In other words, we must affirm the district court's denial of Doe's motion for a new trial unless "there was an absolute absence of evidence to support" the jury's finding that the School Board lacked actual notice. *Id.* (quoting *Bristol Steel*, 41 F.3d at 187).

While we acknowledge that the applicable standard of review is an extremely stringent one, our review of the trial record leaves no doubt that under the correct actual-notice standard, the jury's finding wholly lacks evidentiary support. The record brims with unrebutted evidence demonstrating that the School Board, through appropriate officials, received multiple reports that objectively provided notice of an allegation that Doe had been sexually assaulted by Smith. To summarize just some of this uncontradicted evidence:

- On March 13, 2017, Doe wrote a statement at Assistant Principal Hogan's request. In that statement—which was later published to the jury at trial—Doe described that Smith "started rubbing [her] legs" and then "proceeded to move [her] hands close to his genitals and then pulled down his pants." J.A. 2515. Doe "moved [her] hand away but he moved [her] hand back onto his genitals." *Id.* She wrote: "I was so shocked and scared that I did not know what to say or do." *Id.* Smith "then started to move his hands towards [her] and [Doe] tried to block him but he still put his hands up [her] shirt and down [her] pants." *Id.*

- At trial, Hogan testified that during the March 13 meeting, Doe stated that she did not think the sexual contact with Smith was consensual—which was also documented in Hogan's own notes from that meeting. During her testimony, Hogan admitted that this statement indicated "a lack of consent." J.A. 1208.

19

- Shortly after her meeting with Doe, Assistant Principal Hogan met with Doe's mother. Both Hogan and Doe's mother testified at trial that during their meeting, Doe's mother stated explicitly that Smith's touching of Doe was nonconsensual and that the incident was "a sexual assault." J.A. 1298–99, 1613.

- School officials also received reports from other members of the school community explicitly alleging that Smith had sexually harassed Doe—including an email from a band student, a written statement from another band student, and an email from a concerned parent of an Oakton alumnus. For example, one bandmate of Doe and Smith sent an email titled "Need to Report Peer Pressure and Sexual Harassment" to an Oakton counselor, who then forwarded the email to Assistant Principals Hogan and Taylor. J.A. 2523–24. The email alleged that Smith pressured Doe into nonconsensual sexual activity.

If these facts do not show that the School Board had actual notice, we don't know what would. Doe clearly conveyed that Smith's touching was unwelcome and nonconsensual, and that she was "shocked and scared." J.A. 2515. And reports from other concerned individuals, including Doe's mother, explicitly described the bus incident as "sexual assault" or "sexual harassment." J.A. 1298–99, 1613, 2523–24. There can simply be no debate that a reasonable official would understand explicit reports of a "sexual assault" or "sexual harassment" as, well, reports of sexual harassment.[8]

---

[8] Indeed, while officials' *subjective* understanding that an allegation involves sexual harassment is not required, here, it is clear that Hogan actually understood the reports she received as alleging "sexual assault"—providing further proof that a reasonable official would certainly have understood Doe to be alleging sexual harassment. At trial, Hogan admitted that within a few days of the bus incident, she was aware of a "possible" sexual assault. J.A. 1186–87. And according to her testimony, Hogan understood, at the time of her interview with Doe, that if Doe were to press charges, it would be for "[s]exual harassment." J.A. 1213. Hogan also testified that she and Principal Banbury "talked about" whether they "could call [the incident] a sexual assault" based on "the evidence that [they] had." J.A. 1291. Finally, when Doe's mother asserted that Smith's nonconsensual touching was "a sexual assault," Hogan responded that she and the other school administrators "did not come to that same conclusion, that it was a sexual assault." J.A. 1299. All of this

In sum, our review of the record compels us to conclude that no evidence supports the jury's finding that the School Board lacked actual notice of the alleged sexual harassment. To the contrary, the record contains extensive evidence confirming that the School Board, through appropriate officials including Assistant Principal Hogan, received multiple reports alleging Smith's sexual assault of Doe.[9] Therefore, Doe is entitled to a new trial under Rule 59 unless we find alternative grounds for affirming the judgment below.

### III.

The School Board offers two such grounds, both of which it presented to the district court in its unsuccessful motion for judgment as a matter of law. Specifically, the School Board argues that we should affirm the denial of Doe's motion for a new trial because no reasonable jury could find that (1) the School Board acted with deliberate indifference; or (2) the sexual harassment Doe suffered was so severe, pervasive, and objectively offensive that it deprived her of equal access to the educational opportunities or benefits provided by her school.

We review *de novo* the district court's denial of the School Board's motion for judgment as a matter of law. *Baynard*, 268 F.3d at 234. In doing so, we "must view the

---

evidence indicates that the School Board was both objectively and subjectively aware that there was an allegation of a sexual assault.

[9] We emphasize that we do not impugn the seriousness with which the jury approached this case, and our opinion should not be read as a criticism of the jury. Rather, the jury very likely reached a conclusion devoid of support in the record because it was not properly instructed on the correct legal standard for actual notice.

evidence in the light most favorable to [Doe], the nonmovant, and draw all reasonable inferences in [her] favor without weighing the evidence or assessing the witnesses' credibility." *Id.* at 234–35. Ultimately, we must reject the School Board's arguments unless no reasonable jury could rule in Doe's favor on one or both of the two issues raised—deliberate indifference and deprivation of access to educational opportunities or benefits.[10]

*Id.*

---

[10] The School Board did not cross-appeal from the district court's denial of its motion for judgment as a matter of law—which makes sense, as it prevailed before the jury. Because the School Board does not seek to modify the district court's judgment, it may rely on "any matter appearing in the record in support of the judgment" without filing a cross-appeal. *Blum v. Bacon*, 457 U.S. 132, 137 n.5 (1982). But because the School Board did not cross-appeal, we are not directly reviewing the district court's denial of judgment as a matter of law.

Nevertheless, we deem it appropriate to evaluate the School Board's alternative arguments as if the School Board were appealing from that denial. Generally, a party can challenge the jury's verdict in one of two ways—"[t]he party may assert that the proceeding was in some fashion so tainted with error that the party should be given a new trial, or it may assert that its opponent's evidence failed to create an issue on which reasonable persons could differ, and that as a matter of law the dissatisfied party should be awarded judgment as a matter of law." 20 Charles Alan Wright & Mary Kay Kane, FED. PRAC. & PROC. DESKBOOK § 101 (2d ed.).

Here, we are faced with a unique posture, in which the School Board—despite having prevailed at trial—challenges two specific findings of the jury in its opposition to Doe's appeal seeking a new trial. Given that the School Board is obviously not seeking a new trial, its attack on the jury findings should be construed as a request for judgment as a matter of law. *See id.* Indeed, the parties agree that we should apply the judgment-as-a-matter-of-law standard here. Moreover, it would hardly be fair to affirm the judgment below on an alternative ground—and effectively overturn a jury finding—unless no reasonable jury could find for Doe on that issue.

As explained below, we conclude that a reasonable jury could find for Doe on both issues. Therefore, neither of the two grounds offered by the School Board precludes us from granting Doe a new trial.

A.

The School Board first argues that no reasonable jury could find that it acted with deliberate indifference—a question that the jury below did not reach. Under Title IX, a school acts with deliberate indifference where its "response to the [alleged] harassment or [the] lack [of any such response] is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. While deliberate indifference is a high standard that requires more than a showing of mere negligence, *see Baynard*, 268 F.3d at 236, "half-hearted investigation or remedial action will [not] suffice to shield a school from liability," *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016).

Here, various evidence in the record, when considered together in the light most favorable to Doe, could persuade a reasonable jury to find that the School Board acted with deliberate indifference. To summarize some of that evidence:

- Despite having received reports alleging that Doe experienced nonconsensual sexual touching on the bus ride to Indianapolis, school officials, including Assistant Principal Taylor, took no action to protect Doe or to offer emotional support to her during the five-day trip. Nor did any school official ever reach out to Doe, check in on her, or notify her parents about the alleged incident.

- Instead, school officials, including Principal Banbury, made inappropriate jokes about the reported incident. For example, when Assistant Principal Taylor emailed Banbury asking how many inches of snow Oakton was expected to get in the coming days, Banbury responded, "How many inches under the blanket or on the ground?" J.A. 2494; *see also* J.A. 994–95 (Banbury admitting during trial that this comment was alluding to "Doe stroking [] Smith's penis" under the blanket and thus was "inappropriate").

23

- Doe testified at trial that when she met with Assistant Principal Hogan and Safety and Security Specialist Baranyk after the band trip, Baranyk tried to dissuade her from taking any legal action, telling her that "there was really nothing [she] could do" and that "the school wasn't liable for anything." J.A. 1745.

- Doe further testified that during the same meeting, Baranyk asked her a number of accusatory questions, including what she was wearing and why she did not scream during the bus incident. When Doe responded that she did not scream because she "was on a bus with . . . 60 people that [she] had known for most of [her] high school years" and did not want to be embarrassed, Baranyk asked her in a sarcastic manner, "Oh, well, how do you feel now?" J.A. 1745–46. While Baranyk was asking these questions, Hogan just "sat there for the most part." *Id.* At trial, Doe testified that the school officials "made [her] feel like [she] was in the wrong" and they did not believe her story. *Id.* at 1747–48. Doe also described their demeanor and tone toward her as "angry" and "menacing." *Id.*

- Despite the multiple reports that Smith had sexually assaulted Doe, school officials, including Assistant Principal Hogan, discussed with Doe, *but not with Smith*, the possibility of being disciplined for engaging in sexual activity on a school trip.

- Although Assistant Principal Hogan interviewed Doe, Smith, and two of their bandmates who also went on the trip, she never spoke with other students who were identified as potential sources of information about the bus incident and Doe's demeanor in the immediate aftermath of the incident.

- In concluding that there was insufficient evidence indicating Smith had sexually assaulted Doe, Assistant Principal Hogan seemingly relied in large part on the fact that at the time Smith began to touch Doe, her head was rested on his shoulder and she was wearing his hat. During the trial, Hogan testified that she believed "those things[,] . . . for an 18-year-old boy, [were] signs that [Doe was] a willing participant." J.A. 1286. Hogan's testimony suggested that the assistant principal either gave little weight to or did not really believe Doe's vital statement that she tried to block Smith from touching her and pulled her hand away—presumably because Smith denied its truth. But notably, Smith acknowledged at trial that he was not entirely truthful during his meeting with Hogan, as he initially denied ever grabbing or touching Doe on the bus, only to change his story and admit it later.

Based on this evidence, a reasonable jury could draw any number of conclusions that would support a finding of deliberate indifference. For instance, a jury could reasonably conclude that the school officials improperly trivialized and dismissed the reports of sexual assault; that they simply assumed, without adequate investigation, that the bus incident was a consensual sexual encounter between teenagers; that they neglected to take even the minimal step of checking in on Doe to make sure she was okay; that they tried to sweep the reports under the rug so as not to cause trouble for Smith, one of their star students who went on to attend a prestigious public university; that they engaged in a "blame-the-victim" mentality in investigating and dealing with the bus incident; or that their decision to believe Smith's story over Doe's—even after Smith had initially lied to them about whether he had touched Doe—was likely attributable to bias.

Accordingly, we conclude that, faced with the evidence described above, a reasonable jury could find that the School Board's response to the alleged sexual assault was clearly unreasonable.[11] Even though the jury, after a new trial, could weigh all of the evidence and find there to be no deliberate indifference, we believe affirming the denial of a new trial on this alternative ground is unwarranted at this stage. Therefore, we reject the School Board's argument that the lack of deliberate indifference provides an alternative ground for affirming the denial of Doe's motion for a new trial.

---

[11] We acknowledge that the record also contains evidence showing that the school provided a number of accommodations requested by Doe and her parents in the months after the alleged sexual assault. However, when the record as a whole is viewed in the light most favorable to Doe, such accommodations do not provide us a sufficient basis for concluding that no reasonable jury could find deliberate indifference here.

For his part, our dissenting colleague argues that as a matter of law, the School Board cannot be found deliberately indifferent under Title IX because school officials received notice of the alleged sexual harassment "only after the fact," and "no school conduct, or lack thereof, caused any [further or continued] sexual harassment" of Doe. Dissenting Op. at 38 (emphasis removed). However, contrary to our dissenting colleague's assertion, Title IX liability based on student-on-student harassment is not necessarily limited to cases where such harassment "occur[s] after [the school] receives notice" and is "caused" by the school's own post-notice conduct. *Id.*

In *Davis*, the Supreme Court explained that an educational institution could be liable under Title IX not only where its deliberate indifference "'cause[s] [students] to undergo' harassment," but also where such indifference "make[s] them liable or vulnerable" to harassment. *Davis*, 526 U.S. at 645 (second alteration in original). And under the latter theory of liability, "other courts have found (or countenanced the possibility of finding) Title IX liability, even though the plaintiff alleged only a single incident of pre-notice harassment." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1295–97 (11th Cir. 2007).[12] Notably, the First Circuit has

---

[12] Courts of appeals have actually divided on the issue of whether a single, isolated incident of pre-notice harassment may be sufficient to trigger Title IX liability. The First and Eleventh Circuits have indicated that such an incident, if serious enough, would be sufficient. *See Fitzgerald*, 504 F.3d at 172–73 (1st Cir.); *Williams*, 477 F.3d at 1295–97 (11th Cir.). On the other hand, the Eighth, Ninth, and Tenth Circuits have held that *post-*notice harassment is required to show a school's deliberate indifference. *See K.T. v. Culver-*

emphasized that a single instance of pre-notice, student-on-student harassment could "form a basis for Title IX liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity." *Fitzgerald*, 504 F.3d at 172–73.

We agree with the First and Eleventh Circuits that a school may be held liable under Title IX based on a single, pre-notice incident of severe sexual harassment, where the school's deliberate indifference to that incident made the plaintiff more vulnerable to future harassment, or otherwise had "the combined systemic effect of denying [equal] access to a scholastic program or activity." *Id.* This reading of Title IX is consistent with the plain language of the statute, which reads: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). As the Supreme Court noted in *Davis*, "[t]he statute makes clear that, whatever else it prohibits, *students must not be denied access to educational benefits and opportunities on the basis of gender*." *Davis*, 526 U.S. at 650 (emphasis added).

Even a single incident of sexual harassment, if sufficiently severe, can inflict serious lasting harms on the victim—physical, psychological, emotional, and social. And where such harms deprive the victim of the ability to fully participate in or to benefit from the

---

*Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017); *Escue*, 450 F.3d at 1156 (10th Cir.); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000).

educational opportunities provided by their school, and where this deprivation remains unremedied or is compounded as a result of the school's deliberate indifference, the victim surely is "denied access to educational benefits and opportunities on the basis of gender"— which Title IX clearly prohibits. *Id.* In such situations, the school's inadequate response to the alleged sexual harassment leaves the victim more vulnerable to further harassment.

Thus, we hold that a school may be held liable under Title IX if its response to a single incident of severe sexual harassment, or the lack thereof, was clearly unreasonable and thereby made the plaintiff more vulnerable to future harassment or further contributed to the deprivation of the plaintiff's access to educational opportunities. Because we conclude that a reasonable jury could make such a finding in this case, we decline to affirm the district court's judgment based on a lack of deliberate indifference.

B.

The School Board also asserts that we should affirm the judgment below because, as a matter of law, Doe was not deprived of equal access to the educational opportunities or benefits provided by her school. Because the jury specifically found that the alleged sexual assault occurred and that it caused such a deprivation for Doe, the School Board asks us to conclude that the jury's findings on those points were unreasonable. Again, we reject the School Board's argument as meritless.

First, the School Board misconstrues the law by claiming that *its own response* to the alleged sexual harassment did not exclude Doe from any educational opportunities or benefits. But the Supreme Court has explained that a Title IX plaintiff must establish "*sexual harassment . . .* that is so severe, pervasive, and objectively offensive that it can be

said to deprive the [plaintiff] of access to the educational opportunities or benefits provided by the school." *Id.* at 650–51 (emphasis added). In other words, the main object of inquiry for this prong is the alleged sexual harassment, rather than the defendant's response thereto. *See id.*; *see also Jennings*, 482 F.3d at 696–99. Indeed, the latter is relevant only to the issue of deliberate indifference. Thus, to the extent that the School Board claims it did not bar Doe's access to educational opportunities, its argument is misguided.

But more importantly, we conclude that the record, viewed in the light most favorable to Doe, could lead a reasonable jury to find in Doe's favor on this issue. In *Jennings*, we explained that a victim of sexual harassment may be deprived of access to educational opportunities or benefits in at least three different ways: if the harassment (1) "results in the physical exclusion of the victim from an educational program or activity"; (2) "'so undermines and detracts from the victim['s] educational experience' as to 'effectively den[y her] equal access to an institution's resources and opportunities'"; or (3) "has 'a concrete, negative effect on [the victim's] ability' to participate in an educational program or activity." *Jennings*, 482 F.3d at 699 (alterations in original) (quoting *Davis*, 526 U.S. at 650–51, 654). In assessing whether the alleged harassment caused such a deprivation, the factfinder must consider all of the "surrounding circumstances" and use "[c]ommon sense[] and an appropriate sensitivity to social context" to "identify objectively hostile or abusive conduct." *Id.* at 696 (first quoting *Davis*, 526 U.S. at 651; then quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

Here, Doe's testimony and evidence, if credited, indicate that she was a victim of a serious sexual assault, during which Smith—without Doe's consent—touched her intimate

body parts under her clothes, digitally penetrated her vagina, and forced her to pleasure him by stroking his penis. One can hardly dispute that such sexual violence, which would constitute a criminal offense in most, if not all, jurisdictions, would have a severe and traumatic impact on any high school student.[13] Indeed, in *Jennings*, we held that a jury could reasonably find that the "verbal sexual abuse" allegedly suffered by the college-student plaintiff "was sufficiently severe or pervasive to" deprive her of equal access to educational opportunities or benefits. *Id.* at 698–99. While the damaging effects of verbal sexual harassment may equal or even exceed those of physical sexual assault in certain cases, we believe a reasonable jury could conclude that the sexual violence Doe allegedly suffered was *at least* as severe, offensive, and harrowing as the verbal harassment experienced by the plaintiff in *Jennings*.[14] *See also Davis*, 526 U.S. at 653–54 (holding that the plaintiff sufficiently alleged actionable sexual harassment where her minor daughter suffered "objectively offensive touching" that amounted to "criminal sexual misconduct").

---

[13] *See* 6A C.J.S. Assault § 73 (updated June 2021) (defining "criminal battery" as "harmful or offensive touching"); 87 A.L.R.3d 1250 (originally published in 1978) (defining the offense of "sexual battery"); *see also Rape*, Fed. Bureau of Investigation, https://ucr.fbi.gov/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/violent-crime/rape (defining rape as the "[p]enetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim").

[14] Generally speaking, while federal and state laws criminalize physical sexual assault, they prescribe only civil remedies for verbal sexual harassment. *See Overview of Rape and Sexual Violence*, Nat'l Inst. Just., U.S. Dep't of Just. (Oct. 25, 2010), https://nij.ojp.gov/topics/articles/overview-rape-and-sexual-violence; *Sexual Harassment*, Rape, Abuse & Incest Nat'l Network, https://www.rainn.org/articles/sexual-harassment.

Moreover, the record includes significant evidence supporting a finding that the alleged sexual assault had a concrete, negative effect on Doe's ability to participate in the educational opportunities or benefits provided by her school. For example, the record contains evidence from which a reasonable jury could conclude that:

- Doe's academic performance and class attendance declined after the band trip. During her sophomore year (i.e., before the alleged assault), Doe was absent three times and never tardy. But in her junior year, she was absent seventeen times and tardy four times. And whereas Doe received five A or A-'s and one B on her final exams in her sophomore year, she received three A or A-'s, a B, a B-, a C, and a D+ on her final exams in her junior year.

- After the band trip, Doe felt so terrified of Smith that she altered her behavior in school and limited her participation in band activities to avoid him. At trial, Doe testified that after the alleged assault, she "was so uncomfortable being around . . . Smith that [she] had to sit out of band class" until the band director rearranged the seating to keep Doe and Smith as far apart as possible. J.A. 1755. During that time, she sat alone in a small, windowless practice room away from her bandmates, which made her feel "isolated" and "very alone." *Id.* Doe also missed the band's end-of-year concert because she did not want to see Smith. Doe testified that while band had long been an important part of her life, she found it difficult to enjoy and fully participate in band activities after the alleged assault—even in her senior year, after Smith had graduated.

- As a result of the alleged sexual assault, Doe suffered psychological and emotional trauma that interfered with her daily functioning. She experienced increased feelings of anxiety and anger, nightmares, flashbacks, intrusive thoughts about the assault and the meetings with school administrators, and difficulty eating, sleeping, and concentrating. Doe sought and received professional counseling for several weeks both in her junior and senior years in an effort to cope with the trauma caused by the alleged assault. She was diagnosed with adjustment disorder with anxiety.

Based on these and other concrete, negative effects supported by the record, a jury could reasonably find that the alleged sexual assault was severe enough to deprive Doe of

31

equal access to educational opportunities or benefits.[15] Indeed, we held the same in *Jennings* where the plaintiff—just like Doe—presented evidence showing that the alleged harassment made her "feel humiliated, anxious, and uncomfortable," "caused her to suffer severe emotional distress," and thereby "had a negative impact on her participation . . . in [school programs] and on her academic performance." *Jennings*, 482 F.3d at 699–700. We see no reason to treat this case differently. Therefore, we reject the School Board's invitation to affirm the judgment below on this ground.

IV.

Because no evidence in the record supports the jury's finding that the School Board lacked actual notice or knowledge of the alleged sexual harassment, and because we find no alternative grounds for affirming the judgment below, we conclude that Doe is entitled to a new trial.[16] Accordingly, we reverse the district court's denial of her Rule 59 motion and remand for a new trial consistent with the legal standard set forth in this opinion.

---

[15] We respectfully disagree with our dissenting colleague's assertion that the sexual assault Doe allegedly suffered was not sufficiently severe to be actionable under Title IX because it was "an isolated, one-time incident." Dissenting Op. at 34. Although a single, isolated incident generally does not provide a basis for Title IX liability, we have recognized that such an incident may be sufficient if it is "extremely serious." *Jennings*, 482 F.3d at 696 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *see also Fitzgerald*, 504 F.3d at 172–73 (noting that a single instance of sexual harassment could "form a basis for Title IX liability if that incident were vile enough"). Here, we believe a jury could reasonably conclude that the sexual assault allegedly suffered by Doe as a high school student (including digital penetration of her vagina) and the lasting trauma caused by that incident were serious enough to trigger Title IX liability.

[16] Curiously, the dissent claims that "[t]he majority opinion . . . vacates the jury's verdict [in part] because it concludes that the school . . . refused to discipline the offending

32

student." Dissenting Op. at 34. Our good colleague is mistaken. Nothing in our analysis rests on the fact that the school officials decided not to discipline Smith.

Nor does our decision "improperly substitute the majority's finding for the jury's," as the dissent asserts. *Id.* Rather, we merely vacate the jury's finding on actual notice because it was based on an incorrect legal standard for evaluating whether such notice existed, and because we conclude that no evidence in the record supports the jury's finding under the correct standard. *See supra* note 9. Indeed, the dissent too acknowledges that "whether the school received notice of the [bus] incident . . . could hardly have been in dispute," as it was "actually told of the incident." Dissenting Op. at 35.

NIEMEYER, Circuit Judge, dissenting:

The jury in this case returned a verdict in favor of the School Board, finding that it was not liable under Title IX for a single incident of student-on-student sexual harassment. The majority opinion nonetheless vacates the jury's verdict because it concludes that the school received notice of the incident *after the fact* and refused to discipline the offending student. Not only does this conclusion improperly substitute the majority's finding for the jury's, it does so based on a fundamental misunderstanding of the school's liability under Title IX.

I

During a band trip to perform at a music festival, a male student of Oakton High School in Vienna, Virginia, engaged in sexual touching of a fellow female student while the two were sitting together on a bus. The female student told school officials that the touching was not consensual. After the school was notified of the incident and conducted an investigation, receiving somewhat conflicting accounts, it concluded that a "sexual assault" had not occurred and imposed no discipline.

The incident occurred while the two students were sitting together on a bus covered by a blanket, and no school official or chaperone knew at the time that it was taking place. It was an isolated, one-time incident, and no evidence forecasted repetition. Indeed, there was no suggestion at trial that any other such incident took place thereafter, whether by the same male student or by another of the female student's peers. In other words, the

34

harassment was not systemic. Moreover, there was no evidence that the school *caused* either the incident or any other sexual harassment.

The female student filed suit against the Fairfax County School Board, alleging that the school violated Title IX because it acted with deliberate indifference to the report of her sexual assault and therefore was liable to her for damages. The jury found that the male student had, indeed, sexually harassed the female student and that the incident was sufficiently severe to deprive her of equal access to the educational opportunities or benefits provided by the school. But the jury returned a verdict in the School Board's favor, finding that the School Board did not have sufficient knowledge of the sexual harassment to give rise to liability.

The majority opinion focuses almost entirely on whether the school received notice of the incident — a fact that could hardly have been in dispute. The school was actually told of the incident and conducted an investigation. The majority opinion then ceremoniously concludes that the School Board had actual knowledge of the incident, and because the jury had found that the school did not receive knowledge sufficient for liability, the majority opinion vacates the jury verdict and orders a new trial. While the majority opinion goes to great lengths to show that the School Board received notice of the incident and therefore had actual knowledge of it, it barely addresses whether such notice created liability under Title IX.

I conclude that the receipt of after-the-fact notice does not impose liability on the School Board in the circumstances of this case. While, unremarkably, I agree with the majority that the school received notice of the incident, the knowledge that was acquired

did not make the School Board liable under Title IX. To have liability, the school had to receive knowledge of conduct *such that the school's indifference to the known conduct actually caused the harassment* that denied the student the benefits of the educational programs or activities of the school. In short, as explained in detail by the Supreme Court, liability can be imposed on the school *only* where it is shown that the school's own conduct "*caused* the [sex] discrimination." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (emphasis added) (cleaned up). This requirement is foundational, as a school is liable under Title IX only when the school's own deliberate conduct amounts to or causes sex discrimination.

## II

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Although the provision does not mention any private right of action against a school when such discrimination occurs, the Supreme Court has found an implied private right of action in the statute that permits students to sue educational institutions for damages. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 688–89 (1979). But the Court carefully cabined that cause of action in subsequent decisions, rejecting any notion that schools face strict liability under Title IX or can be imputed with liability under the principles of agency or constructive notice. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998). In *Gebser*, the Court held that *only the school's own conduct*

can justify liability and that such conduct can be shown only where a school has "actual knowledge" (i.e., "notice") of the harassment in circumstances where it has an *opportunity* to rectify it and its deliberate indifference to the knowledge causes harassment by failing to end or prevent it. *Id.* at 289–90. As the Court stated, the school must have "actual knowledge of the [sexual] conduct" and also "have an opportunity to take action to end the harassment or to limit further harassment." *Id.* at 289. In short, its deliberate indifference must be "the *cause* of the violation." *Id.* at 291 (emphasis added).

In *Davis v. Monroe County Board of Education*, the Supreme Court again considered a school's Title IX liability — this time in the context of student-on-student harassment — and reemphasized the kind of notice that imposes liability on a school. After reaffirming that Title IX did not permit imputed liability based on agency principles or constructive notice, the Court made clear that only *the independent conduct of the school causing harassment* could result in the school's liability. It explained, "recipients [of federal funds] could be liable in damages only where their own deliberate indifference effectively *caused* the discrimination." *Davis*, 526 U.S. at 642–43 (emphasis added) (cleaned up). And it repeated the proposition more fully, giving emphasis to it:

> If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference subjects its students to harassment. That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it.

*Id.* at 644–45 (cleaned up).

As a consequence of its holdings in both *Gebser* and *Davis*, the *Davis* Court observed:

> Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have [a systemic] effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.

*Davis*, 526 U.S. at 652–53. For a school that does not directly discriminate, harassment must occur after it receives notice — making it something that the school can prevent. And "[b]y limiting private damages actions to cases having a *systemic* effect on educational programs or activities," the Court "reconcile[d] the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior." *Id.* at 653 (emphasis added).

The *Davis* Court contrasted its doubt about a single act of one-on-one peer harassment — which would not have a systemic effect — with the facts before it. There, a student was "the victim of repeated acts of sexual harassment by [a peer] over a 5-month period," during which, the facts could show, the school had knowledge of the conduct but "made no effort whatsoever . . . to put an end to the harassment." *Davis*, 526 U.S. at 653–54. This case does not fit that mold. The incident here was a one-time act of sexual misconduct by a male student, and the school learned of the incident only after the fact, with no opportunity to prevent it. Moreover, there was no suggestion that the harassment continued and therefore no suggestion that the school had failed to prevent any continuing or additional harassment. In short, no school conduct, or lack thereof, *caused* any sexual harassment, as is required for the school's liability under Title IX.

The jury in this case found that the school did not have sufficient notice as required for liability under Title IX, and this is well supported by the record. While the school did receive after-the-fact notice of a single incident, it did not have the type of notice required by Title IX, i.e., notice that provided the school with an "opportunity" to correct the situation. *See Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613, 622 (6th Cir. 2019), *cert. denied*, 141 S. Ct. 554 (2020) (noting that the "critical point" for a school's liability under Title IX is "that the [school's] response must bring about or fail to protect against the further harassment"); *see also K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058–59 (8th Cir. 2017); *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1155–56 (10th Cir. 2006); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000).

Thus, I would affirm.